**PEGASUS ENERGY GROUP, INC., Appellant,**

v.

**CHEYENNE PETROLEUM COMPANY, Appellee.**

No. 13–97–498–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1999.

Rehearing Overruled Oct. 21, 1999.

Jeffrey W. Shell, Addison, for Appellant.

Les J. Strieber, III, Davis, Adami & Cedillo, Inc., Jason R. Cliffe, San Antonio, Wallace B. Jefferson, Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, for Appellee.

Before Chief Justice SEERDEN and Justices HINOJOSA and YAÑEZ.

## OPINION

Opinion by Justice HINOJOSA.

After a bench trial, the trial court signed a final judgment in favor of appellee, Cheyenne Petroleum Company. By seven points of error, appellant, Pegasus Energy Group, Inc., contends: (1) the trial court's interpretation of the Exploration Agreement and Authority for Expenditure was erroneous; (2) the award of prejudgment interest was erroneous; (3) the trial court's failure to find a breach of contract against Cheyenne was against the great weight and preponderance of the evidence; (4) the trial court's failure to find damages, including attorney's fees, in favor of Pegasus was against the great weight and preponderance of the evidence; (5) Cheyenne failed to segregate attorney's fees among its various claims and defenses; (6) the award of attorney's fees to Cheyenne was unreasonable and excessive, and a remittitur should be ordered; and (7) the testimony of Everett Holseth was admissible and its exclusion affected a substantial right of Pegasus. We modify the trial court's judgment and, as modified, affirm.

### A. BACKGROUND

On May 2, 1990, Pegasus and Inco Oil Corporation, by letter agreement, entered into an Operating Agreement for the Devine Nuts well.[1] Pegasus assumed one hundred percent of the risks, costs, and expenses for the drilling, completing, and equipping of the well. On May 8, 1990, Cheyenne entered into an agreement with Pegasus to participate in the drilling and operation of the Devine Nuts well. Cheyenne agreed to take thirty percent of the risks, costs, and expenses of the well, and Pegasus agreed to retain the remaining seventy percent. Inco prepared the AFE for this well. The Operating Agreement for the Devine Nuts well did not include an approval clause for expenditures. Cheyenne did not drill this well; it was drilled by Inco. Cheyenne became the operator of the well on June 15, 1990, after it was drilled, and the original Operating Agreement was maintained for the well. Cheyenne billed Pegasus for its proportion of the expenditures on the well in accordance with the Operating Agreement.[2] Disputes arose in relation to this well when Pegasus failed to pay Cheyenne for its proportionate share of the operating expenses, because Pegasus contended it was being improperly billed.

By letter agreement, dated August 6, 1990, Pegasus acquired an interest in the Buttles and Garcia/Ealand Prospects from Inco. As in the Devine Nuts well, Pegasus

1. We mention the Devine Nuts well to establish the relationship between Pegasus and Cheyenne. Although there were disputes in the billing of the Devine Nuts well in the original lawsuit, the parties do not challenge the trial court's judgment concerning that well. Thus, we will not address the billing disputes for the Devine Nuts well. Pegasus does challenge the determination of prejudgment interest and attorney's fees. Therefore, we will address those issues as they appear in our discussion of the Ledwig well.

2. As stated in Exhibit C, paragraph 2, of the Operating Agreement, entitled "Accounting Procedure/Joint Operations:"

 [The] Operator shall bill Non–Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

 Article XV, paragraph G, of the Operating Agreement states:

 In the event any party shall ever be required to bring legal proceedings to collect any sums due from any other party or to enforce any other right under this agreement, then the prevailing party in such action shall also be entitled to recover from the non-prevailing party all court costs, costs of collection, and a reasonable attorney's fee, all of which shall also be secured by the lien provided herein by the non-prevailing party.

agreed to pay for one hundred percent of the risks, costs and expenses of the well. On August 29, 1990, Cheyenne acquired an interest from Pegasus and began to participate in the drilling of the Buttles and Garcia/Ealand Prospects.[3] The Exploration Agreement between the two companies allowed Cheyenne to buy in for thirty percent of the risks, costs, and expenses of the well, and Pegasus agreed to retain the remaining seventy percent. In the agreement, Cheyenne was designated as the operator of the well, which meant that Cheyenne would do the actual drilling. The initial test well in the Garcia/Ealand Prospect was the Ledwig well. Attached to the agreement, as Exhibits "C" and "D" were two "Authority for Expenditure" ("AFE"), which were estimates of the costs to perform the specific operations for each well.[4] Included in the agreement, at the suggestion of Pegasus, but drafted by Cheyenne, was a cap on expenditures because Pegasus feared Cheyenne might unnecessarily spend because Cheyenne had never drilled a horizontal well. This provision, set out in paragraph six of the Exploration Agreement, provides, "[p]arties further agree that written approval shall be required for any expenditures which exceeds [sic] the AFEs attached hereto by ten percent (10.00%) or more."

As for the Devine Nuts well, the Operating Agreement stated the manner in which the operator was to bill the working interest owner, and the manner in which the working interest owner was to make payment.[5] Essentially, when Cheyenne incurred an expense, Pegasus was billed for its proportionate share of the expenses.

After the execution of the Exploration Agreement, disputes arose between the parties regarding payments due Cheyenne from Pegasus. Cheyenne claimed that Pegasus had delayed and failed to make payments for which Pegasus was responsible. Pegasus asserted it had made all payments due and that Cheyenne had charged for expenses it was not responsible for under the agreement. The disagreement is based on the approval clause found in paragraph six of the Exploration Agreement. Pegasus asserts the agreement required Cheyenne to obtain written approval if expenditures on any item in the AFE exceeded 110% of the estimate for that item. Cheyenne asserts the agreement required written approval only if the total expenditures exceeded 110% of the total estimate in the AFE.

### B. Procedural History

On July 16, 1991, Cheyenne filed suit against Pegasus for breach of contractual obligations to pay Cheyenne as operator for expenses incurred in the operation of the Devine Nuts and Ledwig wells. Cheyenne further alleged that: (1) Pegasus had committed fraud by making false representations as to its intent and ability to meet financial obligations under the Ledwig well Operating Agreement; (2) Pegasus engaged in negligent misrepresentation by supplying false information; (3) Pegasus misrepresented or fraudulently concealed its intent to honor the contractual obligations of the Operating Agreement; and (4) Pegasus's conduct was committed knowingly, willfully, and maliciously, or, with such heedless and reckless disregard of the rights and welfare of Cheyenne as

---

3. The Buttles Prospect is not the subject matter of the original lawsuit or this appeal.

4. Exhibit "C" was for the Buttles Prospect and "D" was for the Garcia/Ealand Prospect.

5. As stated in Exhibit C, paragraph 2, of the Operating Agreement entitled "Accounting Procedure/Joint Operations:
 [the] Operator shall bill Non–Operators on or before the last day of each month for

their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

to show conscious indifference, that Cheyenne was entitled to exemplary damages.

Pegasus filed a counterclaim against Cheyenne, alleging that Cheyenne had breached its obligations as the operator under the terms of the Operating Agreements for the wells. Pegasus generally alleged that Cheyenne had inaccurately and improperly billed Pegasus for the operations of the Devine Nuts and Ledwig wells. Specifically, Pegasus alleged that Cheyenne had breached its obligation as operator of the Devine Nuts well by: (1) allowing a pumping unit to burn up because Cheyenne had failed to fill it with oil and subsequently erred in billing Pegasus for this unit; (2) failing to dispose of idle or surplus materials; (3) losing income from the production of oil as a result of the ruined pump; (4) allowing the well to flare gas for over a month resulting in the loss of gas; (5) not operating the well in a workmanlike manner; (6) asserting invalid and unsubstantiated claims against Pegasus in that Cheyenne repeatedly claimed that Pegasus had not paid its share of the costs and expenses associated with the

well; and (7) failing to open a separate bank account for the prospect. As to the Ledwig well, Pegasus alleged that Cheyenne had breached its obligations as the operator by: (1) exceeding the line item amount specified in the AFE and by not obtaining written approval from Pegasus if its expenditures were to exceed any line item by ten percent; (2) charging Pegasus for items not authorized by the Operating Agreement; and (3) asserting invalid and unsubstantiated claims against Pegasus in that Cheyenne repeatedly claimed that Pegasus had not paid its share of the costs and expenses associated with the well. Pegasus further alleged that Cheyenne had misrepresented its experience and ability to drill and operate the Devine Nuts and Ledwig wells.

In its findings of fact and conclusions of law and supplemental findings of fact and conclusions of law, the trial court found that the approval clause in paragraph six of the Exploration Agreement required Cheyenne to obtain written approval for expenditures that exceeded the total AFE by ten percent.[6] On April 28, 1997, the

---

6. It is important to note that the trial court made this ruling after the following:

(1) On February 10, 1995, the judge made a preliminary finding which stated "[the approval clause] can be harmonized with the sentence on page 2 of Exhibit "D" of the same agreement that reads 'It is specifically understood this AFE is an estimate only and all participants shall pay their proportionate share of the actual cost incurred.' Any expenditures over 10% of the AFE's requires the written approval of Pegasus, whether anticipated or unanticipated.... The participants are to pay their proportionate shares of actual expenditures up to 110% of the AFE's without written approval." The judge then stated that he would "accept further input on whether Cheyenne was excused by waiver and/or estoppel from asking for written approval on expenses that exceeded the AFE's by 10%, and whether the 110% limit without written approval pertains to each line item AFE, separate operation AFEs, or the total AFE.... My thinking on which AFE/AFEs to use is that the Vertical Hole, Horizontal Hole, and Completion opera-

tions each have contingency amounts. The contingency amounts would have no meaning if the 110% pertains to each line item."

(2) On May 12, 1995, the judge stated in a letter to the attorneys that his final ruling shall include the following: "The Ledwig Well No.1 Exploration Agreement requires that the operator, Cheyenne, obtain written approval of Pegasus for any expenditure which exceeds the Garcia/Ealand Prospect AFE by 10%."

(3) On May 22, 1995, the judge stated in a letter to the attorneys: "I apologize that my letter was not clear as to what part of the AFE the 110% cap applied. I rule that the 110% cap applies to the total AFE."

(4) On September 26, 1995, the judge stated in a letter to the attorneys: "I am changing my previous ruling on what AFE's were referred to in the paragraph requiring the written approval of Pegasus for expenditures which exceed the AFE's by 10% back to my original contention. There are three possible interpretations of the Exploration Agreement, i.e. each line item AFE's, each of the four operation

trial court found that Cheyenne had suffered damages in the amount of $46,887.34 on the Devine Nuts well and awarded prejudgment interest in the amount of $36,-596.66 on the unpaid and untimely made payments. The trial court also found that Cheyenne had suffered damages in the amount of $101,267.13 on the Ledwig well and awarded $79,041.35 in prejudgment interest. The trial court also found that Cheyenne had incurred attorney's fees in the amount of $293,821.43. The trial court denied Cheyenne's claims for fraud, negligent misrepresentation, fraud in the inducement, and exemplary damages.

As to Pegasus's counterclaim, the trial court found that Cheyenne was not negligent in the operation of the wells and that it did not misrepresent its ability, capability, or competence to operate the wells. The trial court also denied Pegasus's claims for failure to perform as a reasonable and prudent operator, failure to dispose of the defective pump, losing oil production, and failure to timely negotiate gas purchase contracts. The trial court found that Cheyenne had breached the Devine Nuts Operating Agreement by failing to maintain a separate bank account, but found that Pegasus had not incurred any damages from the breach. In calculating damages, the trial court gave Pegasus credit for various expenses, including overhead duplication, technical consultants, tubular reconciliation, technical company labor, and Cheyenne's failure to comply with

the approval clause of the Exploration Agreement for the Ledwig well.

## C. Approval Clause

By its first point of error, Pegasus contends the trial court erred, as a matter of law, in its construction of the Exploration Agreement and the Authority for Expenditure. Pegasus argues that the approval provision in the Exploration Agreement should be construed to require approval of the AFE on a line-by-line basis.

### 1. Standard of Review

When the interpretation of a contract is in issue, the trial court must first determine whether the provisions in question are ambiguous. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). The question of whether a contract is ambiguous is a question of law for the trial court's determination. *Id.* A contract is ambiguous if it is reasonably susceptible to more than one meaning. *Id.* at 393. Neither of the parties argue that the terms of the Exploration Agreement are ambiguous; they simply disagree over its construction and interpretation. A disagreement over the meaning of a contract provision does not render the provision ambiguous. *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex. App.—El Paso 1991, no writ).

When the parties disagree over the meaning of an unambiguous contract,

AFE, or the total AFE. The most reasonable interpretation is the operation AFE's. In the event that Cheyenne anticipated that there would be cost overruns in the operations, only four written approvals from Pegasus would be required. However, if the line item AFE's were selected, there might be 21 approvals required under the Vertical Hole, 16 approvals required under Horizontal Hole, 10 approvals required under Completion, and one approval required under Artificial Lift Equipment, a total of 48 possible written approvals required. On the other hand, it is also not reasonable, that the Exploration Agreement would require Pegasus to pay, for example, its share of the 110%

AFE of $768,295, if the well was not completed and artificial lift equipment was not placed on the well."

(5) On February 2, 1996, the judge states in another letter: "I continue to experience difficulty in interpreting the sentence in the Exploration Agreement.... I now believe that my ruling on May 22, 1995 was correct that the AFE's mentioned in the subject sentence refer to the two AFE's attached to the Exploration Agreement, i.e.: Exhibit "C", Authority for Expenditures on the Buttles Prospect and Exhibit "D", Authority for Expenditures on the Garcia/Ealand Prospect. I rule that the pertinent AFE is the total AFE of $768,205 for the Ledwig # 1 Well."

the court must determine the parties' intent by examining and considering the entire writing in an effort to give effect to the parties' intentions as expressed in the contract. *Coker*, 650 S.W.2d at 393; *First City Nat'l. Bank*, 808 S.W.2d at 136; *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App.—Houston [1st Dist.] 1987, writ denied). The intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex.1981).

■ Legal conclusions of the trial court are always reviewable and the appellate court is not obligated to give any particular deference to those conclusions. *Montanaro v. Montanaro*, 946 S.W.2d 428, 431 (Tex.App.—Corpus Christi 1997, no writ). We review questions of law *de novo*. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *Marsh v. Marsh*, 949 S.W.2d 734, 739 (Tex.App.—Houston [14th Dist.] 1997, no writ). As the final arbiter of the law, the appellate court has the power and the duty to evaluate independently the legal determinations of the trial court. *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 935 (Tex.App.—El Paso 1994, no writ); *Sears, Roebuck & Co. v. Nichols*, 819 S.W.2d 900, 903 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 10 (Tex.App.—Dallas 1988, writ denied). A trial court's legal conclusions will be upheld on appeal unless they are erroneous as a matter of law. *Montanaro*, 946 S.W.2d at 431; *Hofland v. Fireman's Fund Ins. Co.*, 907 S.W.2d 597, 599 (Tex.App.—Corpus Christi 1995, no writ).

### 2. *The Exploration Agreement*

■ In order to understand the controversy between Pegasus and Cheyenne over the interpretation of the Exploration Agreement, it is necessary to set out the pertinent provisions of the agreement. Paragraph six of the agreement states:

6. Cheyenne and Pegasus hereby agree that all funds advanced for AFE estimated expenses pursuant to Paragraph 5 above, shall be placed into a separate account and are to be used only for the costs and expenses pertaining to such test well for which prepayment is tendered. Parties further agree that written approval shall be required for any expenditures which exceed the AFEs attached hereto by ten percent (10.00%) or more.

In each of the AFEs there is a note which states: "It is specifically understood this AFE is an estimate only and all participants shall pay their proportionate share of the actual cost incurred." [7]

The trial court found that the approval paragraph:

required Cheyenne to obtain written approval of Pegasus for any expenditures which exceed the Garcia/Ealand Prospect AFE by ten percent (10%). More specifically, the court FINDS that the term "AFEs" as used in the August 29, 1990 Exploration Agreement, refers to the two AFEs attached to the Exploration Agreement, i.e.: Exhibit "C", Authority For Expenditure on the Buttles Prospect and Exhibit "D", Authority For Expenditure on the Garcia/Ealand Prospect. The Garcia/Ealand AFE of $768,205 [sic] is the AFE total to be applied in determining the expenditures which require written approval. Cheyenne was required to obtain written approval from Pegasus for any expenditures which exceed $845,025.50 (110% of total estimated cost of $768,205.00).

Although the trial court appeared to have a difficult time interpreting paragraph six of the agreement, we conclude

**7.** As we previously stated, there was an AFE for the Buttles Prospect and one for the Gar- cia/Ealand Prospect.

this does not mean the contract is ambiguous. We agree with the parties that the terms of the agreement are not ambiguous. The disagreement over the Exploration Agreement is in the interpretation of the approval clause found in paragraph six.

Pegasus contends the contractual interpretation of the AFE applicable to the Ledwig well should be construed on a line-by-line, item-by-item basis. Pegasus argues that "by concluding that the 110% cap applied to the total AFE, [the trial court] has failed to harmonize and give effect to all of the provisions of the contractual, Exploration Agreement; in effect, rendering meaningless the line-by-line itemization." Pegasus interprets the phrase "any expenditures which exceeds the AFEs attached hereto" to mean line-by-line itemization and contends that the parties intended to place a limit on each of the expenditures so that Cheyenne would watch each line item carefully.

Cheyenne, on the other hand, argues that "AFEs" is plural in paragraph six because the agreement encompasses two wells and there are two AFEs, Exhibits C and D, attached to the Exploration Agreement. Cheyenne contends the approval clause refers to the AFE for the Ledwig well in its entirety.

After reviewing the entire contract, we conclude the trial court's interpretation is correct and the AFE referred to in the approval clause is the total AFE set out by the parties for the Garcia/Ealand Prospect. The pluralization of AFEs in paragraph six in association with the words "attached hereto," is a direct reference to the two

AFEs attached to the agreement, Exhibits C and D.

Paragraph five supports the totality interpretation of paragraph six.[8] At first glance, it appears paragraph five supports the argument that Cheyenne needed to get approval on the four sections of the AFE—vertical hole, horizontal hole, completion, and artificial lift equipment—because of the breakdown of the cost prepayments. A closer analysis, however, establishes that the prepayment terms are really just a graduated method of payment for Pegasus. The prepayment terms also specify that Pegasus is paying its proportionate share of the estimate, no questions asked and no approval needed. Pegasus is not paying per line; rather, prepayment is in three payments—vertical position, horizontal and completion, and artificial lifting. Cheyenne will then use the money as needed, and it is given ten percent above the total AFE for adjustments between the estimated cost and the actual cost of drilling. After Cheyenne has spent 110% of the estimated cost, it must then obtain approval for any other expenditures.

Our interpretation of the approval clause protects the stated concern of Pegasus that it did not want Cheyenne to have an "open checkbook," but it also takes into account the fact that Cheyenne and Pegasus agreed on an estimated cost for drilling the well, as set out in the AFE, and that because both parties realized the estimate was not exact, they allowed for a ten percent buffer before Cheyenne had to go

---

8. Paragraph 5 states:
 Attached hereto as Exhibits "C" and "D" is the Authority for Expenditure (AFE) for each of the initial test wells in the Buttles Prospect and the Garcia/Ealand Prospect, respectfully [sic]. Pegasus hereby agrees to prepay and deliver unto Cheyenne, as Operator, its proportionate share (70.00%) of the estimated tangible equipment and intangible well cost for the vertical portion of each test well within fifteen (15) days after receipt of an invoice and request for such prepayment from Cheyenne, but no later than five (5) days prior to

 spudding such well. The balance of the estimated cost, being the horizontal portion and completion cost as shown on each of the AFEs, shall be forwarded to Cheyenne no later than ten (10) days prior to the horizontal rig moving onto the drillsite location for each of the test wells. In the event Cheyenne purchases artificial lifting equipment for installation on the test wells, Pegasus shall forward to Cheyenne its proportionate share of the cost within fifteen (15) days after receipt of an invoice from Cheyenne.

back to Pegasus for approval of any additional expenditures.

We conclude the trial court's interpretation of the AFE is correct.[9] Pegasus's first point of error is overruled.

### D. Prejudgment Interest

In its second point of error, Pegasus contends the trial court's award of prejudgment interest to Cheyenne was erroneous. Pegasus argues that Cheyenne is not entitled to prejudgment interest because the trial court erroneously applied article 5069–1.05 of the revised civil statutes and Cheyenne did not specifically plead for prejudgment interest.

The trial court awarded prejudgment interest at the rate of ten percent (10%), compounded annually, from July 16, 1991, the date Cheyenne gave notice to Pegasus of the amount due, through April 28, 1997, the date of the judgment.[10] Accordingly, prejudgment interest for the Devine Nuts well is $36,596.00 and for the Ledwig well is $79,041.35.

In the Exploration Agreement, Pegasus and Cheyenne agreed upon an interest rate if a party failed to make a payment on time and essentially breached the contract. This provision is set forth in section I(3)(B) of the Accounting Procedure/Joint Operations. For the Devine Nuts well this provision states:

> Each Non–Operator shall pay its portion of all bills (including advance billings) within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at *Team Bank Dallas* on the first day of the month for which delinquency occurs plus 1% *or* the maximum contract rate

permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court cost, and other costs in connection with the collection of unpaid amounts. (Second emphasis added).

For the Ledwig well this provision states:

> Each Non–Operator shall pay its portion of all bills (including advance billings) within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at *the First Interstate Bank of Oklahoma NA, Oklahoma City, Oklahoma* on the first day of the month for which delinquency occurs plus 2% *or* the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court cost, and other costs in connection with the collection of unpaid amounts. (Second emphasis added).

 Pegasus contends Cheyenne is not entitled to prejudgment interest because it did not specifically request prejudgment interest in its pleadings. Relying upon this Court's opinion in *Dunn v. Menassen,* 913 S.W.2d 621 (Tex.App.—Corpus Christi 1995, writ denied), Pegasus argues that Cheyenne is not entitled to prejudgment interest because it did not plead any statutory basis for prejudgment interest prior to the April 17, 1997, hearing on Pegasus's motion for new trial. We disagree.

 We note Cheyenne specifically asked for prejudgment interest in its first amended original petition. Under section I(3)(B) of the Accounting Procedure/Joint Operations, Cheyenne is entitled to inter-

---

9. We note that Pegasus's interpretation of line item approval would be inefficient in an industry where time is money and the more efficiently a well can be drilled, the better the outlook on the proceeds from that well.

10. In its findings of fact, the trial court states the date of the judgment is April 25, 1997. The record shows that the amended final

judgment was signed on April 28, 1997. The signing of the judgment accords with the court's statement to the parties at the hearing on the motion for new trial that he would sign the judgment on "Monday the 28th." Thus, we will use April 28 as the date of the judgment.

est on the damages determined by the trial court. As stated in *Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.*, 509 S.W.2d 678 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.), "under all of the authorities, the interest contracted for is a part of the debt, as much so as the principal." *Id.* at 687. Because the contract between Cheyenne and Pegasus provided for prejudgment interest, Cheyenne is entitled to prejudgment interest.

■ In this case, the trial court did not use the first option stated in section I(3)(B), but rather chose the second option: "the maximum contract rate permitted by the applicable usury laws in the state in which the joint property is located." The properties are located in Texas, specifically La Salle County, and the contract rates can be determined from article 5069–1.05, § 6 of the Texas Revised Civil Statutes.[11] We assume, since it is not contested, that the option chosen by the trial court is the lesser interest rate, in accordance with the contract. We believe this to be so, given the following statement by Cheyenne's counsel at the motion for new trial:

> The judge, by his own act, can apply the statutory prejudgment interest. Is it to Cheyenne's disadvantage? Sure, because the contractual rate under the contract is higher[.]

By this admission, and the fact that the contract clause is not contested, we conclude the trial court has abided by the provisions of the contract.

## 1. *Article 5069–1.05*

■ In its findings of fact, the trial court stated: "this amount of prejudgment interest was determined by calculations pursuant to Vernon's Annotated article 5069–1.05 of the Texas Revised Civil Statutes Annotated." Pegasus argues this means the trial court determined whether Cheyenne was entitled to prejudgment interest by referring to article 5069–1.05. Cheyenne argues the finding means the trial court referred to article 5069–1.05 to calculate the amount of interest. We agree with Cheyenne.

Just as the supreme court recently endorsed the use of article 5069–1.05 in determining the correct amount of prejudgment interest in *Johnson & Higgins of Texas, Inc. v. Kenneco Energy*, 962 S.W.2d 507 (Tex.1998),[12] the trial court was correct in its use of article 5069–1.05 in determining the correct amount of prejudgment interest to award Cheyenne. The prejudgment interest was "calculated at a rate of 10% (ten) compounded annually from July 16, 1991, the date notice was given by Cheyenne to Pegasus of the amount due, through April 25[sic], 1997, the date of judgment."

The trial court's findings of fact and conclusions of law state that prejudgment interest was determined from July 16, 1991, the date notice was given to Pegasus by Cheyenne. The record reflects this

---

**11.** Effective September 1, 1997, article 5069–1.05 was codified in Chapter 304 of the Texas Finance Code. *See* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Sess. Law Serv. 3435. No Substantive change in law was intended by the codification. Tex. Fin. Code Ann. § 1.001(a); Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 7 & Preamble, 1997 Tex. Sess. Law Serv. 3091, 3603. Because there are no substantive changes, we will refer to the Finance Code, except where reference to article 5069–1.05 is more appropriate, for clarity purposes, because it was used by the trial court.

**12.** Pegasus argues that *Kenneco* was decided after the judgment was signed in this case,

thus it does not apply. We disagree. The supreme court states in *Kenneco:* "Our common law prejudgment interest holding applies to all cases in which judgment is rendered on or after December 11, 1997 **and** to all other cases currently in the judicial process in which the issue has been preserved." *Kenneco*, 962 S.W.2d at 533. (Emphasis added). We believe the present case exemplifies the intended application of the latter portion of the above quote. Pegasus's objection to the trial court's manner of awarding prejudgment interest, the subsequent appeal of this case, and the prejudgment interest in particular, has preserved this issue.

suit was filed on July 16, 1991, the same day notice was given. In *Kenneco*, the supreme court held that "interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Kenneco*, 962 S.W.2d at 531; *see* TEX. FIN. CODE ANN. § 304.104 (Vernon 1998). Because *Kenneco* requires prejudgment interest to start accruing on the earlier date, we conclude prejudgment interest began to accrue in this case on July 16, 1991, the date suit was filed. Accordingly, the trial court was correct in determining that prejudgment interest began to accrue on July 16, 1991.

The trial court calculated prejudgment interest based upon a ten percent (10%) interest rate. Since the appellant does not contest the specific interest rate, we assume ten percent was the judgment interest rate set by the consumer credit commissioner for April 1997 in accordance with sections 304.003 and 304.004 of the finance code. *See* TEX. FIN.CODE ANN. §§ 304.003 & 304.004 (Vernon 1998).

■ While we agree with the trial court's award of prejudgment interest to Cheyenne, the court erred in compounding the interest. In accordance with *Kenneco*, prejudgment interest is computed as simple interest [13] and does not compound. *Kenneco*, 962 S.W.2d at 532; *see* TEX. FIN. CODE ANN. § 304.103 (Vernon 1998). Thus, given the variables stated by the court in its findings of fact, we modify the amount of interest. Our calculations, based upon an interest rate of ten percent, compounded annually, from July 16, 1991 to April 28, 1997 for damages of (1) $46,887.34 and (2) $101,267.13, show that prejudgment interest should be $27,130.43 and $58,596.21, respectively. Thus, we modify the prejudgment interest to reflect our calculations.

2. *Amounts in Court Registry*

■ Pegasus argues in its reply brief that there is "factually insufficient evidence that [the trial court] equitably took into account the amounts held in the registry of the court or otherwise interplead when it arrived at its interest calculations in the April 28, 1997 judgment." Pegasus contends that Cheyenne should not be entitled to prejudgment interest on the amount of money held in the registry of the court. Pegasus argues that the funds it interpleaded into the registry of the court should have been applied toward the judgment before prejudgment interest calculations were made.

While we agree with Pegasus that Cheyenne should not be entitled to prejudgment interest on money that Pegasus had already paid into the registry of the court, we disagree with Pegasus's contention that the trial court erred in its manner of determining the total prejudgment interest award. As the trial court stated in its findings of fact and conclusions of law.:

> The Court FINDS that Cheyenne is entitled to all monies held in the Registry of the Court to satisfy the judgment, with any interest earned on such monies in the Registry to be credited against the interest awarded above. The Court Clerk shall be ordered to account for all monies and interest accrued and turnover said sums to Plaintiff Cheyenne. The Court further FINDS that Pegasus interplead $33,684.00 and $6,739.20 (Total: $40,424.24) into the Court Registry which has been held by the Clerk of the Court at interest. Pegasus is entitled to have the total amount in the Court Registry credited against any judgment amount owed by Pegasus.
>
> The Court further FINDS that any oil and/or gas revenues of Pegasus which have been suspended by Martin Gas shall by Order and Judgment of the Court be paid into the Court Registry

---

13. The difference between "simple interest" and "compound interest" is that "simple interest" does not merge with principal and, thus, does not become part of the base on which future interest is calculated. BLACK'S LAW DICTIONARY 813 (6th ed.1990).

and held by the Clerk of the Court and said amount shall be credited against any judgment amount owed by Pegasus.

Pegasus's second point of error is overruled, but the prejudgment interest amounts are modified to reflect our calculations.

### E. BREACH OF CONTRACT

In its third point of error, Pegasus complains the trial court's failure to find a breach of contract is against the great weight and preponderance of the evidence. Pegasus contends the overcharging by Cheyenne on the audit claims constituted a breach of contract and the trial court should have found a breach.

A trial judge's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex.App.—Houston [14th Dist.] 1990, no writ) (citing *Okon v. Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.)). These same standards apply to a trial judge's failure to make certain findings of fact. *See M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.,* 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). We review the legal conclusions drawn from the facts found by the trial court to determine their correctness. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

When a party with the burden of proof complains on appeal of an adverse finding, the appropriate points of error are "that the matter was established as a matter of law" or that the "finding was against the great weight and preponderance of the evidence." *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983).

When we review a legal sufficiency or "that the matter was established as a matter of law" point, we examine the record for evidence supporting the finding of fact and ignore all evidence to the contrary. *Sterner v. Marathon,* 767 S.W.2d 686, 690 (Tex.1989); *Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). If we find that no evidence supports the finding, we must determine from the record whether the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Hickey,* 797 S.W.2d at 109.

When we review a factual sufficiency or that the "finding was against the great weight and preponderance of the evidence" point, we examine the entire record. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hickey,* 797 S.W.2d at 110. We set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain,* 709 S.W.2d at 176; *Hickey,* 797 S.W.2d at 110.

Pegasus contends the trial court's failure to find a breach of contract by Cheyenne was against the great weight and preponderance of the evidence. Pegasus cites statements made by the trial court at the motion for new trial hearing to support its argument that Cheyenne breached the Exploration Agreement. The court stated:

But I think before when I had ruled that Cheyenne had not breached [sic] contract, I was thinking just by overcharging would not be a breach, but that might be a breach of contract on those audit claims. That's the only change. I think that is a breach of contract. When you charged for the audit claims or the amount in the audit claim that I agreed with Pegasus on. So, like I say, at the time when we were talking about it, I didn't think that was a breach, but now I'll be glad to have you talk about it.

Then, after a brief discussion with counsel, the court said:

Well, let's do this. Let's leave it as is. Mr. Shell, if you—I don't want a brief, but if you can find any cases that would

be apropos on that—because I really don't know.

In its findings of fact and conclusions of law, the trial court stated:

[T]he Court FINDS that a contract existed between the plaintiff Cheyenne Petroleum Company and the defendant Pegasus Energy Group, Inc., there was substantial compliance by the plaintiff, there was a material breach by defendant, and the plaintiff suffered proximate damage thereby.

The court also stated:

The Court FINDS that the Plaintiff Cheyenne failed to comply with paragraph 6 of the August 29, 1990 Exploration Agreement and did not obtain written approval for expenses which exceeded $845,025.50. Therefore, the Court further FINDS that Pegasus is entitled to a credit of $125,788.11 against total due Cheyenne prior to offsets/credits as shown[.]

■■■■■ In its findings of fact and conclusions of law, the trial court found that Cheyenne did not comply with paragraph six of the Exploration Agreement, but did not find that Pegasus had succeeded in proving its cause of action that Cheyenne had breached the contract. As for the comments made by the trial judge during the motion for new trial hearing concerning the alleged breach, we do not find these relevant to the court's findings because, even at the time the statements were made, the trial judge expressed uncertainty and because oral comments do not constitute findings of fact and conclusions of law. *See In Re W.E.R.*, 669 S.W.2d 716, 717 (Tex.1984).

■■■ Now, we must determine whether the trial court's finding that Cheyenne failed to comply with paragraph six of the Agreement, but its failure to find that Cheyenne breached the contract, was against the great weight and preponderance of the evidence.

■■■ When a cause of action is based on breach of contract, there must be some showing of the existence of a contract between the parties; that duties were created by the contract; that a breach of the duties occurred; and that the party sustained damages. *TCI Cablevision of Tex., Inc. v. South Tex. Cable Television, Inc.*, 791 S.W.2d 269, 271 (Tex.App.—Corpus Christi 1990, writ denied). It is undisputed that a contract existed between Cheyenne and Pegasus for the drilling of the Ledwig well, and that duties were subsequently created by that contract. The record shows that Pegasus breached the contract by its nonpayment; but the parties dispute whether Cheyenne breached the contract.

We conclude the trial court's language in its findings of fact and conclusions of law that: "Cheyenne failed to comply with paragraph 6 of the August 29, 1990 Exploration Agreement and did not obtain written approval for expenses which exceeded $845,025.50," establishes Cheyenne technically breached the contract by failing to do what it promised to do. *See Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.*, 826 S.W.2d 638, 640 (Tex. App.—Houston [14th Dist.] 1992, no writ) (breach of contract occurs when party fails or refuses to do something he has promised to do). However, the record does not establish that Pegasus sustained damages from Cheyenne's breach of the contract. Pegasus did not suffer damages because it never paid any of the bills that the audit determined it was overcharged. Thus, even though Cheyenne breached the contract by not complying with paragraph six, Pegasus did not successfully prove its cause of action for breach of contract because it did not sustain any damages as a result of the breach.

Accordingly, we hold the trial court's failure to find a breach of contract on the part of Cheyenne was not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong

and unjust. Appellant's third point of error is overruled.

## F. DAMAGES

By its fourth point of error, Pegasus complains the trial court erred by failing to find damages, including attorney's fees, in favor of Pegasus and against Cheyenne. Pegasus contends this failure to find damages is against the great weight and preponderance of the evidence.

■ While Pegasus's point refers to damages in general, its arguments are based on the trial court's failure to find attorney's fees in favor of Pegasus. Thus, we will only review the trial court's failure to find attorney's fees in favor of Pegasus.

■ In construing a contract, we give the language its plain grammatical meaning unless it would defeat the intention of the parties. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987).

In this case, Article XV, paragraph G of the Operating Agreement provides:

> In the event any party shall ever be required to bring legal proceedings to collect any sums due from any other party or to enforce any other right under this agreement, then the prevailing party in such action shall also be entitled to recover from the non-prevailing party all court costs, costs of collection, and a reasonable attorney's fee, all of which shall also be secured by the lien provided herein by the non-prevailing party.

The Letter Agreement of August 6, 1990 also specifies that: "In the event of any dispute occurring under this agreement, the prevailing party shall be entitled to be reimbursed by the other party for its reasonable and necessary attorney's fees."

■ The term "prevailing party," for the purpose of awarding attorney's fees, refers to a party who successfully prosecutes an action or successfully defends against an action on the main issue. *Emery Air Freight Corp. v. General Transp. Sys., Inc.*, 933 S.W.2d 312, 316 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Weng Enter., Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222–23 (Tex.App.—Houston [1st Dist.] 1992, no writ).

The question we must now consider is what is the main issue in the case before us. Pegasus argues that the main issue is how, and in what manner, the ten percent cap in the Exploration Agreement applied. Cheyenne contends the main issue was whether Pegasus owed Cheyenne money under the terms of the Exploration Agreement.

A review of Cheyenne's original petition establishes that the suit was originally filed because Pegasus had failed and refused to pay multiple monthly billings for the Devine Nuts and Ledwig wells. Pegasus's counterclaim asserted Cheyenne had not acted as a reasonable operator and that:

> Cheyenne has repeatedly asserted that Pegasus has not paid its share of the costs and expenses associated with the Devine Nuts well. Pegasus has always promptly responded in detail with its disputes concerning improper charges asserted by Cheyenne.

Pegasus repeated this claim in reference to the Ledwig well. We note that Pegasus referred to the ten percent cap when it discussed the Ledwig well. Pegasus stated:

> Cheyenne exceeded the line item amount specified in the AFE for drilling and completing the Ledwig well #1. Under the terms of the Exploration Agreement, Cheyenne was required to obtain written approval from Pegasus and the other working interest owners if its expenditures would exceed any line item by ten percent (10%) or more. Cheyenne failed to get this permission and therefore is not entitled to reimbursement of the amounts which exceed ten percent (10%) of any AFE line item figure. The attempts by Cheyenne to assert and collect these amounts constitute a breach of the agreements between the parties.

While we agree with Pegasus that the interpretation of the approval provision in the Exploration Agreement for the Ledwig well was an important part of this case, the main issue was whether Pegasus owed Cheyenne money under the Operating Agreements for *both wells*. The key is that the suit was brought for Pegasus's failure to make payments on both wells, and the approval clause is only present in the Exploration Agreement of the Ledwig well. It is true that Pegasus's contentions resulted in offsets to the amounts owed by Pegasus, but these contentions did not constitute the main issue of the case.

Therefore, it was not against the great weight and preponderance of the evidence for the trial court to find attorney's fees in favor of Cheyenne and to fail to find attorney's fees for Pegasus. We conclude the Exploration Agreement provides clear contractual justification for the award of attorney's fees to appellee, the prevailing party in this action. Appellant's fourth point of error is overruled.

## G. SEGREGATION OF ATTORNEY'S FEES

■ In its fifth point of error, Pegasus complains the trial court erred in its amended final judgment because Cheyenne refused, over a timely objection by Pegasus, to offer evidence segregating attorney's fees among its various claims and defenses. Pegasus contends the trial court erred in its conclusion that an exception applied to the duty to segregate attorney's fees.

■ To show the reasonableness and necessity of attorney's fees, the party seeking attorney's fees must show the fees were incurred while suing the party sought to be charged with the fees on a claim that allows recovery of the fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991); *Stamp–Ad, Inc. v. Barton Raben, Inc.*, 915 S.W.2d 932, 937 (Tex.App.—Houston [1st Dist.] 1996, no writ). When a claim in which attorney's fees are recoverable is joined with another claim in which attorney's fees are not recoverable, a party must segregate the attorney's fees that are recoverable from those that are not. *See Stewart Title*, 822 S.W.2d at 11; *Stamp–Ad, Inc.*, 915 S.W.2d at 937. There is an exception to the duty to segregate "when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." *Stewart Title*, 822 S.W.2d at 11. "When causes of action involved in a suit are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering all claims." *Id.* The determination of whether attorney's fees can be segregated between various claims or defenses is a question for the court. *Aetna Cas. & Sur. v. Wild*, 944 S.W.2d 37, 41 (Tex.App.—Amarillo 1997, writ denied). The failure to segregate when attorney's fees are capable of segregation will require a remand to the trial court so that evidence of segregated attorney's fees may be presented. *Stewart Title*, 822 S.W.2d at 11.

We review the legal conclusions drawn from the facts found by the trial court to determine their correctness. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Conclusions of law are reviewable *de novo*. *Amoco Gas Co. v. MG Intrastate Gas Corp.*, 914 S.W.2d 156, 158 (Tex. App.—Houston [1st Dist.] 1995, no writ). A conclusion of law will be reversed if it is erroneous as a matter of law.

In its findings of fact and conclusions of law, the trial court found that: "Plaintiff is the prevailing party and that the contract and tort claims and counterclaims arise from the same transaction and are so intertwined that the prosecution or defense of them require proof or denial of essentially the same facts."

In its reply brief, Pegasus contends Cheyenne should have segregated its at-

torney's fees because the facts necessary for Cheyenne to recover on its primary claims were not the same as were needed to defeat Pegasus's counterclaims. Pegasus asserts that despite the exception to segregation, Cheyenne's causes of action for fraud, negligent misrepresentation, and fraud in the inducement, and its denial of Pegasus's counterclaims (with the exception of Pegasus's breach of contract claim) did not entail the same facts necessary to recover on its breach of contract claim. *See Coleman v. Rotana, Inc.,* 778 S.W.2d 867, 873–74 (Tex.App.—Dallas 1989, writ denied) (fees incurred in defense of counterclaim are not recoverable unless facts necessary for plaintiff to recover on its claim also serve to defeat the counterclaim).

 Attorney's fees are available for defense of a claim or counterclaim when both the claim and counterclaim are contractual and arise from the same transaction or set of facts. In such cases, the same facts required to prosecute the claim are also required to defend against the counterclaim and a fee claimant is not required to segregate the time the attorney spends preparing his claim and the time spent defending the counterclaim. *Veale v. Rose,* 657 S.W.2d 834, 841 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e).

Cheyenne filed two affidavits from Ricardo Cedillo in its application for attorney's fees. As stated in the affidavits, the attorney's fees incurred by Cheyenne as a result of the litigation was $357,614.43.[14]

In a letter from the trial court to the attorneys, the judge stated:

> I cannot approve Cheyenne's attorneys' fees and costs in the amount of $357,-614.43, as requested. I do not agree with Pegasus on many of the items it feels are not recoverable. However, based on my experience with this case, many of Cheyenne's attorneys' fees and costs are not recoverable. I was able to go through the backup material to Mr. Cedillo's affidavits, and I found items that could be segregated and some that were not recoverable, segregated or not.

After receiving further responses, objections, and another affidavit from Ricardo Cedillo concerning attorney's fees, the trial court determined attorney's fees. By a letter dated October 20, 1996, the trial judge stated:

> I was hoping that Cheyenne would remove some of the items that I feel should have not been included in Cheyenne's attorneys' fees and costs. However, I am not going to deny all attorneys' fees and costs. I have arrived at a total with which I am satisfied.

The trial judge did not accept the additional attorney's fees set forth in Ricardo Cedillo's second affidavit, and he specified eleven entries in the exhibits to Cedillo's affidavits that he excluded from the attorney's fees calculations. The judge also corrected Cedillo's total calculation on his first affidavit from $286,357.52 to $278,-763.42.[15] Once the exclusions were deducted and the fees from an additional law firm were added, the court found that Cheyenne was entitled to attorney's fees in the amount of $293,821.43.[16]

14. Cedillo's first affidavit calculated attorney's fees in the amount of $286,357.52. The second affidavit contained additional attorney's fees of $71,256.91. Together, the attorney's fees incurred by Cheyenne was $357,-614.43.

15. The letter states: "If Mr. Trumpeter is correct in his calculation that the spread sheets supporting Mr. Cedillo's total amount in Affidavit of Richard G. Cedillo adds up to $278,763.42 rather than Mr. Cedillo's $286,-357.52, I will use Mr. Trumpeter's figure."

16. In the October 20, 1996 letter, the trial court directed, "add $278,763.42 to the expenses of Hartzog, Conger, Cason & Hargis found in the Second Supplemental Affidavit of Ricardo G. Cedillo, and subtract the total deductions 1 through 13[sic] above, to reach the total attorneys' fees and costs awarded." In its findings of facts and conclusions of law, the trial court found Cheyenne had incurred the following attorney's fees: $276,514.42 to the law firm of Davis, Adami & Cedillo, Inc. and $17,307.01 to the law firm of Hartzog,

In its brief, Pegasus points to the following statement made by the trial court at the hearing on the motion for new trial concerning attorney's fees:

> On attorney's fees, subjectively I feel like that it probably could be segregated. Objectively, I pulled out everything that I could find from the evidence that I thought that should not have been charged. As far as the amount it's, what, twice what Pegasus has had to pay. But this has been a very complicated case. And I have no idea how to cut it down[.]

Pegasus asserts from this statement that even the trial court believed the attorney's fees should have been segregated, however, it erroneously found that the exception to the segregation of attorney's fees applied in this case.

After reviewing the entire record, we conclude Cheyenne's attorney's fees did not have to be segregated. The issues involved in Cheyenne's claims and the defenses to Pegasus's counterclaims were intertwined to the point of being inseparable.

Pegasus argues the claims made by Cheyenne concerning fraud, negligent misrepresentation, fraud in the inducement, and exemplary damages are tort claims and are not recoverable and should have been segregated. We disagree. For example, Cheyenne's claim for fraud in the amended petition states:

> [Pegasus], by and through its only agent, Joseph McMurrey, made false representations of past and existing material facts related to [Pegasus's] ability and intent to meet his financial obligations under Ledwig # 1 Operating Agreements and related agreements with [Cheyenne].

While Cheyenne is alleging Pegasus committed fraud, the research and representation involved in establishing and presenting this claim were intertwined with Cheyenne's main claim that Pegasus had breached the contract. At a basic level,

Cheyenne believed Pegasus committed fraud because it was not paying its proportionate share of the costs of the well, which in turn set forth that Pegasus misrepresented its ability to pay when the contracts were negotiated. Thus, we conclude the same facts and the same preparation formed the basis of Cheyenne's suit for breach of contract and its suit for fraud.

Another example of inseparability of the issues is based on Pegasus's counterclaim that Cheyenne misrepresented its experience and ability to drill and operate the wells. The basis of Pegasus's claim can be found in the Exploration Agreement. Paragraph 12(A) of the agreement states:

> By executing this Agreement, Cheyenne and Pegasus hereby make the following representations and warranties:
>
> A. Cheyenne and Pegasus are active, experienced and sophisticated participants in the oil and gas business and fully understand that the oil and gas business is extremely risky and hazardous and that any well drilled pursuant to the terms of this Agreement may fail to yield commercial production. Cheyenne and Pegasus have such knowledge and experience in the oil and gas business and are capable of evaluating the merits and risks of participating in this Agreement and performing the duties required of a participant hereunder.

Cheyenne's defense of this counterclaim must be based in large part upon the contract and its terms. For this reason, we believe the claims arise from the same transaction and are so interrelated as to entail proof or denial of essentially the same facts. In order to adequately represent Cheyenne, its attorneys would have reviewed and studied every aspect of the Operating Agreements and Exploration Agreements. Within this process, the attorneys would be setting forth their main

Conger, Cason & Hargis. The total amount of attorney's fees was $293,821.43.

claim that Pegasus breached the contract by not paying its proportionate share of expenses. In order to defend this claim, the attorneys would be looking at the entire relationship between Pegasus and Cheyenne to insure that Cheyenne had abided by the terms of the contract, including that Cheyenne had acted as a reasonable and experienced operator. Thus, Cheyenne would be reviewing the same facts and circumstances involved in bringing its claim against Pegasus for nonpayment to establish that it had fulfilled the terms of the contract and that it had acted as an experienced and reasonable operator.

Therefore, we conclude the trial court was correct in allowing Cheyenne to not segregate its attorney's fees. Pegasus's fifth point of error is overruled.

### H. Unreasonable and Excessive Attorney's Fees

■ By its sixth point of error, Pegasus complains the trial court erred in awarding attorney's fees to Cheyenne because the fees are unreasonable and excessive. Pegasus contends the award of attorney's fees is erroneous because it bears no reasonable proportion or relationship to the amount of actual damages awarded on the Devine Nuts and Ledwig wells.

■ The determination of the amount to be awarded as a reasonable attorney's fee is a question for the trier of fact, but the award must be supported by competent evidence. *Great Am. Reserve Ins. Co. v. Britton*, 406 S.W.2d 901 (Tex. 1966). The trial court's award of attorney's fees will not be disturbed absent an abuse of discretion. *Gonzalez v. Nielson*, 770 S.W.2d 99, 102 (Tex.App.—Corpus Christi 1989, writ denied). A trial court may be reversed for abusing its discretion only when the court of appeals finds the court acted in an unreasonable, arbitrary manner, or acted without reference to any

guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex.1985).

■ Factors to be considered in determining the reasonableness of attorney's fees include the time and labor involved, the nature and complexity of the case, the value of the interest involved, the extent of the responsibilities assumed by the attorney, and the benefits resulting to the client from the attorney's services. *Alexander v. Cooper*, 843 S.W.2d 644, 647 (Tex.App.—Corpus Christi 1992, no writ).

Pegasus contends that, of the total amount of the amended final judgment, excluding interest, the attorney's fees awarded to Cheyenne represents sixty-six percent of the judgment.[17] Pegasus cites *First Natl. Bank of Mercedes v. La Sara Grain Co.*, 676 S.W.2d 183, 185 (Tex. App.—Corpus Christi 1984, no writ), in support of its contention that an award of attorney's fees should ordinarily bear some reasonable proportion to the amount of money involved in the litigation. Pegasus urges this Court to order a remittitur because the attorney's fee award is excessive.

We conclude the attorney's fees awarded in this case, although large, are not unreasonable or excessive. As the trial court stated at the hearing on the motion for new trial:

> As far as the amount it's, what, twice what Pegasus has had to pay. But this has been a very complicated case.

When we consider: (1) the original petition in this case was filed on July 16, 1991, and the amended final judgment was not signed until April 28, 1997; (2) the extensive briefing to the trial court; (3) the multiple days of testimony, including the high degree of technicality; and (4) the voluminous records, contracts, and exhibits involved, we conclude the attorney's fees

---

17. Cheyenne was awarded attorney's fees in the amount of $293,821.43. Cheyenne was awarded damages in the amount of $46,-887.34 for the Devine Nuts well and $101,-267.13 for the Ledwig well.

awarded were not unreasonable or excessive, and no remittitur is necessary.

We hold the trial court did not abuse his discretion in finding that Cheyenne was entitled to attorney's fees in the amount of $293,821.43. Pegasus's sixth point of error is overruled.

## I. EXPERT TESTIMONY

By its seventh point of error, Pegasus complains the trial court erred in excluding the expert testimony of Everett Holseth. Pegasus argues the exclusion of Holseth's expert testimony on the audit report was erroneous because it was needed to explain the AFE ten percent (10%) cap accounting provision in the Exploration Agreement. Specifically, Pegasus contends the trial court should have recognized that the percentage cap accounting provisions had a specialized usage and meaning within the oil and gas accounting field, and the testimony was required to explain the accounting interpretations of the provision.

At trial, Pegasus sought to present the testimony of Everett Holseth, an expert in oil and gas audits and accounting, who conducted an audit on the charges incurred in the drilling of the Devine Nuts and Ledwig wells, and on the ten percent approval clause and alleged AFE excesses for the Ledwig well.[18] Cheyenne objected and argued the testimony should be excluded because it incorporated Holseth's legal conclusions concerning the interpretation of the contract between Pegasus and Cheyenne. The trial court excluded Holseth's testimony on the approval provision because "the whole gist of this case is the meaning of the [approval clause][19] . . . . And that's going to be my ruling—a legal

decision, and he cannot tell me what my legal ruling should be."

The admission and exclusion of evidence is committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 754 (Tex.1995); *Downer,* 701 S.W.2d at 241–42.

To obtain reversal of a judgment based on error in the admission or exclusion of evidence, appellants must show that the trial court did in fact commit error, and that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1); *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992); *Gee,* 765 S.W.2d at 396; *Downen v. Texas Gulf Shrimp Co.,* 846 S.W.2d 506, 512 (Tex.App.—Corpus Christi 1993, writ denied).

Rule 702 of the Texas Rules of Evidence, concerning testimony by experts, provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702.

Pegasus argues that Holseth's testimony should have been admitted because his testimony was:

> factually proffered as probative and admissible evidence of the validity of Pegasus's audit claims. His testimony along with his audit reports was admissible and probative of whether excess charged [the] joint account for items that are agreed to or authorized.

---

**18.** Holseth described the audit as:

primarily a contract compliance audit. The parties have executed agreements, most of them standard agreements prepared by the industry. And this type of audit is very routine and it's primarily a review of the agreements and review of the charges to determine whether or not the operator has

**19.** The approval clause states: "The parties further agree that written approval shall be required for any expenditures which exceeds [sic] the AFEs attached hereto by 10 percent (10.00%) or more."

amounts could be properly charged to the joint account.

Pegasus further claims the exclusion affected a substantial right because the testimony was probative of its audit claims and if allowed, it could have determined the outcome of additional audit claims. Pegasus cites *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265 (5th Cir.1987), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987), where experts in oil and gas accounting were allowed to interpret accounting provisions, because "the provisions had a specialized usage and meaning within the oil and gas field, and the expert accounting testimony was required to explain the accounting interpretation of those provisions." *Id.* at 279–80.

Pegasus contends the rationale of *Phillips* is applicable and controlling in the present case. We disagree. First, *Phillips* is not binding on this Court. Second, unlike the accounting experts in *Phillips*, Holseth's testimony was not required by the court to explain the accounting interpretation of the ten percent approval clause. Unlike in *Phillips*, the approval clause in the Exploration Agreement does not have "a specialized usage and meaning within the oil and gas field." Holseth even testified, "I read [the provision]. I understood it to mean something, and then I discussed that with Mr. McMurrey to determine whether or not that is—I am reading it correctly." This testimony establishes that there was no specialized meaning which Holseth, as an oil and gas auditor, could explain to the court to aid in its legal interpretation of the provision; rather, Holseth, with the apparent aid of Mr. McMurrey, was making his own legal interpretation of the provision and explaining that interpretation to the court. Holseth's legal interpretation encroached upon the province of the court to determine the correct legal interpretation of the clause.

We do not regard Holseth's expert opinion as probative because, although he may be an expert in oil and gas audits and accounting, the question of the application of the ten percent approval provision in the AFE is not a matter for an expert in accounting, but for the court. The legal conclusions in his testimony concerning the audit reports invade the province of the trial court to decide the question as a matter of law. *See United Gas Pipe Line Co. v. Mueller Eng'g Corp.*, 809 S.W.2d 597, 602 (Tex.App.—Corpus Christi 1991, writ denied).

We hold the trial court did not abuse its discretion in excluding the testimony of Holseth. Pegasus's seventh point of error is overruled.

### J. MOTION FOR NEW TRIAL

In each of its eight points of error, Pegasus contends the trial court erred in denying its motion for new trial. A trial court has broad discretion in denying a motion for new trial, and its action will not be disturbed on appeal absent a showing of an abuse of discretion. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983); *Delgado v. Hernandez*, 951 S.W.2d 97, 98 (Tex.App.—Corpus Christi 1997, no writ).

After reviewing all eight points of error, we hold the trial court did not abuse its discretion in denying Pegasus's motion for new trial.

### K. CONCLUSION

The trial court found Cheyenne was entitled to damages for the Ledwig well in the amount of $101,267.13. We have determined prejudgment interest on this amount is $58,526.21.

The trial court found that Cheyenne was entitled to damages for the Devine Nuts well in the amount of $46,887.34. We have determined prejudgment interest on this amount is $27,130.43.

We modify the trial court's judgment to reflect the prejudgment interest determined by this Court. As modified, the judgment of the trial court is affirmed.