ACCEPTED
12-16-00092-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/19/2016 2:38:29 PM
Pam Estes
CLERK

**ORAL ARGUMENT REQUESTED**

**NO. 12-16-00092-CV**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/19/2016 2:38:29 PM
PAM ESTES
Clerk

## IN THE COURT OF APPEALS
## FOR THE TWELFTH DISTRICT OF TEXAS AT TYLER, TEXAS

**PERMIAN POWER TONG, INC.,**
**Appellant,**

**v.**

**DIAMONDBACK E&P, LLC,**
**Appellee.**

**On Appeal from the 441st District Court**
**Midland, County, Texas, Cause No. CV-49854**
**(Hon. Rodney W. Satterwhite)**

## REPLY BRIEF OF APPELLANT

Respectfully submitted,

**R BRENT COOPER**
brent.cooper@cooperscully.com
Texas Bar No. 04783250
**DIANA L. FAUST**
diana.faust@cooperscully.com
Texas Bar No. 00793717
**KYLE M. BURKE**
kyle.burke@cooperscully.com
Texas Bar No. 24073089

**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas 75202
TEL: (214) 712-9500
FAX: (214) 712-9540

**ATTORNEYS FOR APPELLANT**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................2

TABLE OF AUTHORITIES ..............................................................................4

ARGUMENT AND AUTHORITES IN REPLY ................................................8

I.      No Legally Sufficient Evidence Permian Breached the MSA .......................8

    A.      No Direct or Circumstantial Evidence that Permian Breached MSA ........................................................................................9

    B.      No Competent Expert Testimony That Permian Breached the MSA ........................................................................................14

    C.      Diamondback's Complaint About Legal Sufficiency Review Misses the Mark.................................................................16

    D.      Diamondback Relies on Speculation and Inference-Stacking............18

    E.      Equal Inference Rule .....................................................................19

II.     Factually Insufficient Evidence to Support Verdict on Breach....................20

III.    No Legally or Factually Sufficient Evidence that Breach Caused Damages ........................................................................................22

IV.     Evidence Showed that Diamondback's Actions Damaged the Pipe.............27

V.      Evidence Overwhelmingly Showed that Diamondback Failed To Mitigate Its Damages .................................................................29

VI.     Admission of Exhibit 60A Was an Abuse of Discretion.............................30

VII.    Damage Awards Not Supported by Legally or Factually Sufficient Evidence ..........................................................................33

VIII.   Attorney's Fees Awards Are Not Supported by Legally or Factually Sufficient Evidence.................................................................34

CONCLUSION AND PRAYER.................................................................39

CERTIFICATE OF COMPLIANCE ........................................................40

CERTIFICATE OF SERVICE.................................................................41

APPENDIX TO REPLY BRIEF OF APPELLANT...............................42

# TABLE OF AUTHORITIES

**Case**                                                                **Page(s)**

*Argo Data Res. Corp. v. Shagrithaya*,
380 S.W.3d 249 (Tex. App.—Dallas 2012, pet. denied) ................................. 34

*Black Lake Pipeline Co. v. Union Construction Co.*,
538 S.W.2d 80 (Tex. 1976) ............................................................................. 32

*Blankenship v. Mirick*,
984 S.W.2d 771 (Tex. App.—Waco 1999, pet. denied) ................................... 26

*Cammack the Cook, L.L.C. v. Eastburn*,
296 S.W.3d 884 (Tex. App.—Texarkana 2009, pet. denied) ........................... 35

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ...................................................................... 15-18

*Coastal Terminal Operators v. Essex Crane Rental Corp.*,
No. 14-02-00627-CV, 2004 WL 1795355
(Tex. App.—Houston [14th Dist.] Aug. 12, 2004, pet. denied) ....................... 38

*Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*,
136 S.W.3d 227 (Tex. 2004) ........................................................................... 25

*Dawson v. Briggs*,
107 S.W.3d 739 (Tex. App.—Fort Worth 2003, no pet.) ................................. 26

*El Apple I, Ltd. v. Olivas*,
370 S.W.3d 757 (Tex. 2012) ........................................................................... 37

*Feldman v. KPMG LLP*,
438 S.W.3d 678 (Tex. App.—Houston [1st Dist.] 2014, no pet.) .................... 37

*Five Star Int'l Holdings, Inc. v. Thomson, Inc.*,
324 S.W.3d 160 (Tex. App.—El Paso 2010, pet. denied) ................................ 37

*Ford Motor Co. v. Castillo*,
444 S.W.3d 616 (Tex. 2014) ............................................. 8, 11, 13, 14, 19, 20

*Ford Motor Co. v. Ridgway*,
   135 S.W.3d 598 (Tex. 2004) ....................................................................19, 20

*Frost Nat'l Bank v. Heafner*,
   12 S.W.3d 104 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ................. 23

*Garcia v. Gomez*,
   319 S.W.3d 638 (Tex. 2010) ................................................................. 34-36

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
   443 S.W.3d 820 (Tex. 2014) ................................................................. 15-17

*In re E.A.K.*,
   192 S.W.3d 133 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ............ 31

*Interstate Northborough P'ship v. State*,
   66 S.W.3d 213 (Tex. 2001) ........................................................................ 32

*Jamshed v. McLane Exp. Inc.*,
   449 S.W.3d 871 (Tex. App.—El Paso 2014, no pet.) ...................................... 38

*Kindred v. Con/Chem, Inc.*,
   650 S.W.2d 61 (Tex. 1983) ...............................................................9, 13, 14

*Marathon Corp. v. Pitzner*,
   106 S. W.3d 724 (Tex. 2003) .....................................................9, 11, 15, 19, 25

*McGalliard v. Kuhlmann*,
   722 S.W.2d 694 (Tex. 1986) ...................................................................... 34

*Pegasus Energy Grp. v. Cheyenne Pet. Co.*,
   3 S.W.3d 112 (Tex. App.—Corpus Christi 1999, pet. denied) .......................... 34

*Powell v. Vavro, McDonald & Assoc., L.L.C.*,
   136 S.W.3d 762 (Tex. App.—Dallas 2004, no pet) ........................................ 31

*Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.*,
   414 S.W.3d 911 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ..........37, 38

*State Farm Lloyds v. Fitzgerald*,
   No. 03-99-00177-CV, 2000 WL 1125217
   (Tex. App.—Austin Aug. 10, 2000, no pet.) .................................................. 23

*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 686 (Tex. 1989) ............................................................. 32

*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*,
   437 S.W.3d 518 (Tex. 2014) ............................................................. 34

*Tony Gullo Motors I, L.P. v. Chapa*,
   212 S.W.3d 299 (Tex. 2006) ............................................................. 36

*Torrington Co. v. Stutzman*,
   46 S.W.3d 829 (Tex. 2000) ............................................................. 38

*Varner v. Cardenas*,
   218 S.W.3d 68 (Tex. 2007) ............................................................. 37

# IN THE COURT OF APPEALS
## FOR THE TWELFTH DISTRICT OF TEXAS AT TYLER, TEXAS

**PERMIAN POWER TONG, INC.,**
Appellant,

**v.**

**DIAMONDBACK E&P, LLC,**
Appellee.

**On Appeal from the 441st District Court**
**Midland, County, Texas, Cause No. CV-49854**
**(Hon. Rodney W. Satterwhite)**

## REPLY BRIEF OF APPELLANT

**TO THE HONORABLE JUSTICES OF THE TWELFTH COURT OF APPEALS:**

Appellant Permian Power Tong, Inc. ("Permian" or "Appellant") submits this Reply Brief of Appellant, in accordance with rules 9.4 and 38 of the Texas Rules of Appellate Procedure and all local rules of this Court. In reply to the Brief of Appellee[1] Diamondback E&P, LLC ("Diamondback" or "Appellee"), Appellant respectfully states as follows:[2]

---

[1]    Appellant will cite to its Brief of Appellant as "Br." and the Brief of Appellee as "Resp."

[2]    Appellant stands on the arguments and legal authority presented in its opening brief. Thus, to the extent Appellant may not reply herein to a particular assertion or argument or

## ARGUMENT AND AUTHORITES IN REPLY

## I. No Legally Sufficient Evidence Permian Breached the MSA

Diamondback failed to produce legally sufficient evidence that Permian breached the MSA. A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014). In a legal sufficiency review, the court views the evidence in the light most favorable to the verdict. *Id.*

When reviewing all of the evidence in a light favorable to the verdict, courts assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review. *Id.* at 620-21. When reviewing circumstantial evidence that favors the verdict, courts must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *Id.*

---

citation by Appellee, this should not be construed as acquiescence by Appellant in any of Appellee's arguments or waiver by Appellant of any argument made in its Brief of Appellant or in this Reply Brief.

If circumstantial evidence, when viewed in light of all the known circumstances, is equally consistent with either of two facts, neither fact may be inferred. *Id.* Where the circumstantial evidence is not equally consistent with either of two facts, and the inference drawn by the jury is within the "zone of reasonable disagreement," a reviewing court cannot substitute its judgment for that of the trier-of-fact. *Id.*

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, no evidence of the vital fact. *E.g., Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). An inference stacked only upon other inferences, rather than upon direct evidence, is not legally sufficient evidence. *E.g., Marathon Corp. v. Pitzner*, 106 S. W.3d 724, 728 (Tex. 2003).

## A. No Direct or Circumstantial Evidence that Permian Breached MSA

None of the testimony or documents Diamondback points to is legally sufficient evidence that Permian breached the MSA. (Resp. at 19-22).

Diamondback's "evidence" that Permian breached paragraph 11(a)(ii) of the MSA (regarding "utmost skill" and "good and workmanlike performance") is nothing more than speculation or surmise. The third-party pipe inspection referenced by Diamondback ignores that company man Jesus Villasana admitted he only observed inspection of about the first ten pieces. (4RR181-82). Hollis did

9

not see the inspection. (3RR224). Diamondback never went back and checked with the pipe vendor to verify the casing. (4RR18). Diamondback assumed Permian damaged the pipe.

There was no "concession" by Permian that the pipe was not damaged when under its control and lowered downhole. Aaron Caine simply testified he did not remember there being a deformation or defect of the pipe. (4RR118). This is no evidence the *interior* of the pipe was free from damage because Caine did not testify he viewed the pipe interior; Hollis testified that the damage shown from the caliper logs was the *interior* of the pipe (4RR61-62), and Grace testified that exterior damage would not necessarily have been noticeable. (5RR165-66).

Moreover, the caliper logs showed damage at places above and below the location of Permian's slips, and showed damage areas shorter and longer than Permian's slips. (5RR129-131). Diamondback's expert could not explain how the slip could cause different lengths of damage. (4RR242).

Next, Diamondback's "evidence" that Permian failed to comply with the MSA's requirement that Permian's tools and equipment be free from defect falls apart under the terms of the MSA. Diamondback relies on its assertion that Permian did not keep records of the use/maintenance of tools used on the Baron 14-11 job. (Resp. at 20-22).

Nowhere does the MSA require that Permian keep such records. (CR 20). Diamondback does not and cannot point to any provision of the MSA requiring

10

Permian to document the maintenance and testing of its equipment, what equipment would be used on this well, or the serial numbers for such. (*See id.*). Any purported failure to document the equipment used or its maintenance cannot form the basis of a breach of the MSA. Diamondback points to no evidence that Diamondback required Permian document the use, testing, or maintenance of its tools or equipment. Permian cannot have breached a nonexistent provision of the MSA.

Diamondback's "evidence" is nothing more than an assumption: i.e., because no documentation exists, we assume the incorrect equipment was used and/or it was not adequately maintained and tested. This is no evidence that Permian breached the MSA.[3] *Castillo*, 444 S.W.3d at 620-21; *Marathon Corp.*, 106 S.W.3d at 728.

Diamondback points to no evidence that Permian's crew was not suitably trained or sufficiently experienced. (Resp. at 21-22). Diamondback nakedly asserts that Permian "failed to provide formal training" or "supply training manuals." (Br. at 21).

Nowhere does the MSA require that Permian provide "formal" training or training manuals. (*See* CR17-27). The MSA simply requires that Permian's

---

[3]    That Permian may have sent the wrong equipment to a previous job is no evidence that wrong equipment was sent or used on *this* job. Even if the wrong equipment were sent out, it could not possibly have been *used* due to the physical characteristics of the pipe and the slips/dies. (5RR69-72, 102-03).

employees are "sufficiently experienced and suitably trained to perform the Work." (CR20).

Regarding training, Diamondback's assertion that use of the term "worm" meant Permian's employees were inexperienced is false and a gross mischaracterization of the testimony. (*E.g.*, Resp. at 4, 21-22). Caine *actually* said that he *started* as a "worm" back in 2002—eleven years before this incident—and through training and experience progressed through the ranks to become a crew hauler around 2012. (4RR98-100).

Caine did not admit that his crew members were "inexperienced." (Resp. at 21-22). Caine testified that even someone called a "worm" might have 4-5 years' experience. (4RR125-28). Caine testified that Mills, Holman, and Key had at least six years, five years, and a year experience, respectively, that Caine had worked with each of his crew members many times and they were experienced, and that he had no concerns—"not even a little bit"—that any of them couldn't do the job they were assigned. (4RR125-28).

Clearly, Caine did not testify that his crew members were "inexperienced." That the four crew members had never all worked together on the same job is no evidence they weren't each suitably trained and experienced.

Further, Diamondback's reliance on its expert testimony is misplaced, as Britton admitted he had no idea how Permian's crew was trained:

A. . . . <u>I have no idea how the Permian men were trained</u>.

12

Q. But yet you're willing to say that they were inadequately trained?

A. Because of the problems we had on this well, <u>I have to assume</u> something was done wrong. And if they were trained properly, we wouldn't have had these problems.

(4RR249). *Castillo*, 444 S.W.3d at 620-21; *Kindred*, 650 S.W.2d at 63.

Diamondback's assertion that Villasana "personally witnessed these same inexperienced 'worms' taking on crew chief responsibilities and operating tong equipment that only skilled crew members should operate" again mischaracterizes the record. (Resp. at 22). Villasana said that near the end of the casing run, "a younger man was running the tongs." (4RR170). Villasana did not testify that this person was a "worm" or "inexperienced"; he testified that someone *else* (not from Permian) referred to him as a worm. (4RR171-72). Villasana did not testify to the identity of this "younger man." (*See id.*). Villasana testified he did not know the members of the Permian crew, or how much experience they each had. (4RR176). Villasana testified that he didn't know if the three other members of Caine's crew were capable of running the tongs, but if someone had three or four years' experience, they would be capable. (4RR176-77).

Ultimately, the "evidence" Diamondback points to is no evidence that Permian's employees were not sufficiently experienced or suitably trained to perform the work, as the MSA required. *Castillo*, 444 S.W.3d at 620-21; *Kindred*, 650 S.W.2d at 63.

### B. No Competent Expert Testimony That Permian Breached the MSA

Diamondback urges that testimony by its expert, Britton, supports that Permian breached the MSA. (Resp. at 22-24). But Britton's testimony is irrelevant and based on assumptions and Britton's lack of the facts.

Britton's testimony about the need for "formal" training is irrelevant and cannot form the basis of a breach of the MSA, which <u>does not require</u> "formal" training or manuals. All it requires is that employees are "*suitably* trained" and "*sufficiently* experienced." (CR20) (emphasis supplied). Further, Britton admitted that most casing crews get their training on the job. (4RR248-49).

Britton's testimony that Permian's crew was not adequately trained lacked a factual basis. Britton admitted that "I have no idea how the Permian men were trained" and assumed they weren't adequately trained. (4RR249). Britton admitted he gave his opinion without hearing Caine's testimony about the experience level of Caine's crew. (4RR248). Yet, this house of cards is the basis for Diamondback's assertion that Permian's crew was inadequately trained. *Castillo*, 444 S.W.3d at 620-21; *Kindred*, 650 S.W.2d at 63.

Britton's testimony about the MSA's tool and equipment requirements is irrelevant, speculative, and lacked a factual basis. Again, the MSA <u>did not</u> require that Permian keep records of the tools and equipment used on the Diamondback job or documentation on the maintenance or testing of its equipment. (CR20).

14

Britton's speculative opinion is: because there is no documentation of tool maintenance, we can infer it did not happen, then infer this must mean the equipment was faulty, and finally infer that this purportedly faulty equipment caused the problem. *See Marathon Corp.*, 106 S.W.3d at 729-30. This testimony lacks any factual basis because Lemons, Caine, and Bownds all testified at length on the inspection and maintenance that occurs with every piece of equipment. (4RR108, 113, 129-30, 5RR14-25, 64-69). *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832–33 (Tex. 2014) (if expert's opinion is "based on assumed facts that vary from the actual facts," the opinion "is not probative evidence . . . if the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence."); *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005). Similarly, there is no evidence the wrong equipment was sent to the job. Britton admitted he was not testifying that Permian brought the wrong equipment. (4RR244).[4]

---

[4] Diamondback's statements that Permian failed to follow industry protocol are misplaced. (Resp. at 20, 23). Diamondback attempts to convert this case into a negligence case, asserting "industry protocol" like standard of care. But Diamondback dropped its negligence suit and proceeded only on breach of contract. (5RR8). The MSA does not require daily cleaning, weekly inspection, bi-annual teardown, and annual x-ray tests on the slips. (*See* CR17-35). Regardless, Diamondback ignores all the evidence by Caine, Lemons, and Bownds that the equipment is cleaned, inspected, "miked," and repaired every time before and after a job. (4RR108, 113, 129-30, 5RR14-25, 64-69).

15

Similarly, such testimony could not support that Permian breached a requirement to perform work with utmost skill and in a good and workmanlike manner. (Resp. at 23). Britton's conclusion that the caliper logs showed that Permian's equipment caused damage was wholly speculative. Britton could only assume that the slips caused damage because of his belief the pipe was good when it went into the well. (4RR204-05). Britton's opinion that Permian used small slips did not account for Caine's testimony that slips were color-coded, and checked for size and interior integrity. (4RR231-32). Britton originally opined that the slips were too small, but there was no testimony of wrong slips or die size. (4RR235-36). Then, Britton stated there must have been some malfunction inside the slip. (*Id.*). But he did not know this because he could not examine such. (*Id.*). Britton had no explanation for the different length of damage on different sections of the pipe. (4RR241-42). He did not dispute Caine's testimony that the pipe was made up to optimum torque. (4RR247-48).

Ultimately, Britton's testimony was nothing more than surmise, speculation, and assumption, untethered from the actual facts. *See Houston Unlimited, Inc.*, 443 S.W.3d at 832–33; *City of Keller*, 168 S.W.3d at 813.

## C. Diamondback's Complaint About Legal Sufficiency Review Misses the Mark

Diamondback's assertion that Permian misapplied the no-evidence challenge is misplaced. (Resp. at 24-25). The portions of Permian's brief cited by

16

Diamondback primarily detail the *lack* of evidence *Diamondback* produced at trial. Piece by piece, Permian demonstrated that evidence was speculative, irrelevant, and without a factual basis. (*See* Br. at 30-34, 39-41, 48-49). Diamondback's complaint seems directed at those portions of the brief explaining that Diamondback's expert Britton's opinions were without factual basis where they did not consider the controverting evidence. (*See* Br. at 34-35, 42-43).

Reviewing courts cannot disregard contextual evidence, competency evidence, circumstantial equal evidence, and conclusive evidence. *City of Keller*, 168 S.W.3d at 810-18. Further, courts must "rigorously examine the validity of the facts and assumptions on which [expert] testimony is based[.]" *Houston Unlimited*, 443 S.W.3d at 832–33. If an expert's opinion is unreliable because it is "based on assumed facts that vary from the actual facts," the opinion "is not probative evidence." *Id.* "[I]f the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence." *Id.* at 833. "[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813. An appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis. *Id.*

17

And the reviewing court does not disregard contrary evidence when reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827. Further, evidence that conclusively establishes the opposite of a vital fact is part of a legal sufficiency review. *Id.* at 814-15. Diamondback's complaint about Permian's legal sufficiency challenge is lacking.

## D. Diamondback Relies on Speculation and Inference-Stacking

Diamondback indeed piles speculation and inferences on one another. (Resp. at 25-26). While Diamondback contends that the record here differs from *Marathon Corp.*, as explained, all of Diamondback's "evidence" does not say what Diamondback claims, and its expert's opinions are based on assumptions, speculation, and inferences.

Again, neither Hollis, nor Bernard, nor Villasana could offer testimony that Permian did not perform the work in a good and workmanlike manner; they had no knowledge. (*See* Br. at 31-32). Diamondback's assertion that Permian's witnesses testified to such is unfounded. Hollis and Villasana had no personal knowledge that the wrong or defective tools or equipment were used; Hollis could only "assume" the wrong slips were used. (Br. at 40). Neither Hollis nor Villasana had knowledge on whether Permian's crew was sufficiently trained. (Br. at 48-49). Diamondback's assertion that Permian's witnesses testified otherwise mischaracterizes the testimony.

18

That only leaves Diamondback's expert Britton, who stacked assumptions and inferences to conclude that Permian breached the MSA. *Marathon Corp.*, 106 S.W.3d at 729-30. Britton testified he didn't know how Permian's employees were trained, yet he assumed they were not adequately trained. (4RR249). Britton testified he hadn't seen documentation of the maintenance and inspection of tools and equipment, so he assumed it didn't happen (despite his acknowledgment he didn't hear Caine's testimony regarding inspections and maintenance). (4RR231). Britton could only "assume" the slips caused damage, after Permian shot down Britton's theories about overtorquing and small slips. He couldn't explain how the slips caused inconsistent damage. (Br. at 32-33).

Diamondback's evidence is indeed like that in *Marathon Corp.* It is nothing more than assumptions, speculation, and inference stacking. *See Marathon Corp.*, 106 S.W.3d at 729-30.

### E. Equal Inference Rule

While Diamondback urges the equal inference rule does not apply (Resp. at 27-29), the evidence in support of Diamondback's theory that Permian damaged the pipe is so meager that no reasonable inference can be drawn in support of the verdict. *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 621 (Tex. 2014); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

As explained, there is no direct or competent lay or expert testimony that Permian breached the MSA. Damage to the pipe when the collars were bucked on

at the manufacturer was equally consistent with Diamondback's assertion that the pipe was without defect and that Permian damaged it. (5RR133-35). The caliper logs did not "prove" that the *slips* damaged the pipe; they only showed damage to the *interior* of the pipe. (*See* 6RR 226-33; 4RR61-62). If there had been something defective with Permian's slips themselves, one would expect uniform damage along the entire casing string. This was not the case. Further, the lowest 2650' of pipe had no damage. (4RR256-57). Britton guessed that the additional weight above 2650' must have contributed to the damage, but could offer no explanation why. (4RR257-58). Is just as consistent with pipe that was defective and could not withstand the additional weight below it, even though Permian's slips were the right size and functioning properly. It also equally consistent with the pipe being damaged or defective prior to use on the well, or that the damage was caused by the driller. (*See* 4RR240). Thus, the jury could not reasonably infer that Permian breached the MSA. *See Castillo*, 444 S.W.3d at 621; *Ridgway*, 135 S.W.3d at 601.

## II.     Factually Insufficient Evidence to Support Verdict on Breach

Even if Diamondback produced legally sufficient evidence of breach—and it did not—Diamondback did not produce factually sufficient evidence of breach; the overwhelming weight of the evidence showed that Permian did not breach the MSA.

Diamondback produced no evidence that Permian's employees were not trained; Diamondback's expert admitted he had no idea how they were trained

(4RR249), and admitted that casing crews receive on-the-job training. (4RR248-49). The MSA did not require "formal" training. Nor did Permian's crew chief say that two of the crew members were "worms" in the sense of being inexperienced; all members were experienced and sufficiently trained, and the crew hauler Caine had worked with them many times before and had no reservations about their abilities. (4RR125-28; Br. at 51-53). Even Villasana said that when he saw someone different using the tongs to make up the joints, it looked like the operator "knew what he was doing," the joints "were being appropriately made up," and Villasana didn't see anything that caused him concern on how the tong was being operated. (4RR179). The only *actual* evidence of the level of training was that Permian's employees were more than sufficiently trained and experienced. (*See* Br. at 51-53).

Diamondback's evidence that Permian failed to perform the work in a good and workmanlike manner was speculative and based on assumptions. Permian produced overwhelming evidence that its employees used the correct tools and equipment, that the crew could not have used the wrong slips, that no issues were encountered during the 14-11 well casing job, and that there was no way the slips could have caused the damage shown in the caliper logs. (Br. at 36-39).

Diamondback's witnesses could only "assume" the slips caused the damage. (3RR229-30; 4RR204-05).[5]

The great weight of the evidence showed that Permian complied with the MSA's tool and equipment maintenance requirements. (Br. at 43-47). Diamondback's reliance on some non-existent records-keeping requirement is misplaced. The overwhelming weight of the evidence showed how Permian's tools and equipment were of the best quality and free from defect. (Br. at 43-47). Diamondback produced no evidence that wrong or defective tools were used on the job.

The jury had no choice but to conclude that Diamondback did not meet its burden to show that Permian breached the MSA.

## III.  No Legally or Factually Sufficient Evidence that Breach Caused Damages

The evidence is legally and factually insufficient to support a jury verdict that Permian's alleged breach caused Diamondback damage. (Br. at 53-58).

Diamondback's suggestion that the "resulted from" language in the charge created a different causation standard is incorrect. (Resp. at 33-34). The "resulted from" language mirrors Texas Pattern Jury Charge 115.3 for breach of contract

---

[5]  Diamondback's assertion that the caliper logs "proved uniform damage" is demonstrably false. (*See* 4RR241-42, 5RR127-31; *Compare* 6RR226 *with* 6RR228). Even Diamondback's expert admitted the damage was not uniform. (4RR241-42).

cases. *See* Comm. On Pattern Jury Charges, State Bar of Tex., TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE, & EMPLOYMENT, PJC 115.3 (2014). This language requires the same causation analysis in breach of contract cases: whether the damages "are the natural, probable, and foreseeable consequence of the defendant's conduct." *See State Farm Lloyds v. Fitzgerald*, No. 03-99-00177-CV, 2000 WL 1125217, at *4-*5 (Tex. App.—Austin Aug. 10, 2000, no pet.) (analyzing causation under "natural, probable, and foreseeable consequence" standard where jury charge used "resulted from" language); *see also Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 108-11 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Diamondback points to no authority supporting that "resulted from" language creates a different causation standard.

Diamondback's evidence of causation was speculative and less than a mere scintilla, even considering meager circumstantial evidence. No one could confirm whether the third-party inspector actually inspected all 127 pieces of casing; Villasana only witnessed approximately ten joints being inspected. (4RR181-82). Diamondback's assertion that Villasana "personally inspected the pipe before PPT began its work and confirmed the pipe contained no defects" is incorrect. (Resp. at 36) (*See* 4RR175). The most he could say was that, "to the best of [his] knowledge" the pipe was in "good and adequate condition." (4RR175). Caine could only testify he didn't remember there being a deformation of the pipe when it was being lifted and lowered to go in the hole (4RR118), and Lemons merely

23

said that a dented pipe would be seen with the naked eye and he wouldn't expect the crew to put visibly damaged pipe in the hole. (5RR49-50, 56). But Grace testified that such damage would not necessarily have been visible in the field, given the dark pipe. (5RR165-66).[6]

Diamondback's assertion that the pipe deformations were "uniform" and at the "exact location" where the slips gripped each joint is not accurate. (Resp. at 36, 38). The evidence showed the damage was wildly inconsistent, at different areas below the collar, and varied in length from inches to feet. (6RR226-33; 5RR128-33; 4RR241-42).

Bownds didn't concede Permian "caused the pipe damage." (Resp. at 36). Hollis said Bownds gave him the "impression" that Permian overtorqued the pipe. (4RR79). But prior to meeting with Diamondback about the well problems, Diamondback's superintendent Leonard Bernard told Bownds that Permian overtorqued the pipe (5RR84-85), that Diamondback's people were mad at Permian and thought it was their fault the casing was messed up, and urged Bownds to bring some discounted invoices as an accommodation. (5RR84-88). Bownds was ambushed at the meeting with the drilling logs (which he had no experience reading), and felt intimidated. (5RR88-89). Diamondback was trying

---

[6] It was dark and rainy the night Permian ran the casing. (4RR151).

to get him to agree that Permian overtorqued the pipe.  (5RR91-92).  But Bownds did not believe Permian did anything wrong to cause the damage.  (5RR 90-92).

While Diamondback points to Britton's testimony as evidence of causation, that testimony was wholly unsupportable, speculative, and conclusory.  (*See* Br. at 55-58).  Britton could only assume that the slips caused damage because of his belief the pipe was good when it went into the well.  (4RR204-05).  He admitted he did not know what the problem with slips was that he assumed occurred; he admitted there was no testimony that someone put the wrong size slips/dies in.  (4RR235).  He speculated and guessed that there was a malfunction in the slip area, but did not explain the malfunction.  (4RR236, 238).  He admitted that he could not explain why a slip that is about two feet in length could cause different lengths of damage—some longer than, some shorter than, the slip—on the pipe.  (4RR242).  He even conceded that if the slips were pinching the pipe, you would see similar damage down the string, depending on the problem.  (4RR234-35). *See Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (conclusory or speculative opinion testimony is no evidence); *Marathon Corp.*, 106 S.W.3d at 729-30.

Expert Grace explained that the damage did not happen while the casing was being run by Permian.  (5RR157-58).  The slips could not have caused the damage.  (5RR127-30).  Britton admitted the casing could have been damaged due to the driller (i.e., not Permian).  (4RR240).  Grace explained there was no way Permian

25

could have caused this damage, he was certain there was something wrong with the pipe before it went in the hole. (5RR157). His testimony about casing damaged from the manufacturer was based on his general experience with overseas casing and the fact that Permian could not have caused this damage. (5RR155-58). And again, he said any pre-existing damage would not necessarily have been visible to the crew. (5RR165-66).[7]

Even if, as Diamondback asserts, Hollis (or Bownds) may have initially believed the pipe was overtorqued, Hollis admitted he had no direct evidence the pipe was overtorqued (4RR14-15), and admitted this was the first caliper log he'd interpreted to indicate overtorquing. (4RR60). Britton explained that the caliper logs would not really tell you if the pipe were overtorqued; you'd have to physically look at the pipe. (4RR212-13). Regardless, both experts affirmatively stated that overtorquing, even if an issue, did not cause the failure/damage. (4RR214; 5RR136).[8]

---

[7] Diamondback's assertion that Grace's credibility was undermined by his testimony about environmental concerns is misleading. (Resp. at 39 n.13). Grace actually explained that Diamondback's purported concerns about neighborhood groundwater were unfounded because the groundwater was already protected behind surface casing and cement. (5RR161-62).

[8] The causation analysis in *Dawson v. Briggs*, 107 S.W.3d 739 (Tex. App.—Fort Worth 2003, no pet.) and *Blankenship v. Mirick*, 984 S.W.2d 771 (Tex. App.—Waco 1999, pet. denied)—both personal injury cases—does not aid Diamondback. (Resp. at 34). In both cases the event sued upon had been established by default or admission, leaving plaintiffs to prove the connection between the event sued upon and the injury. Here, Diamondback cannot even establish the event sued upon, i.e., how Permian breached the MSA. But even under the causation standard in those cases, neither lay testimony nor expert testimony established a causal nexus here, where the evidence showed wildly varying pipe damage (which Britton could not

26

Diamondback produced no legally or factually sufficient evidence tying any purported breach of the MSA by Permian to damages.

## IV.   Evidence Showed that Diamondback's Actions Damaged the Pipe

Hollis admitted that Diamondback's actions removed metal from the pipe and caused damage.   (3RR146-59, 4RR27-28, 6RR429)). Yet, Diamondback claims that all the damage was caused by Permian's alleged breach.  (Resp. at 41-44).

Diamondback asserts that only "outside forces" caused the pipe damage. (Resp. at 41).  This ignores Hollis's own testimony about the bits and string mills Diamondback used to shear away metal from the interior-side of the casing. (3RR116-18, 123-24).  It also ignores Hollis's testimony that Diamondback's use of the string mills could have cut the holes in the intermediate casing.  (3RR146-59; 4RR27-28).  Hollis stated: "Looks like we wore holes in the casing where the pinched in spots were."  (6RR429). Expert Grace testified that the 120-foot long string mill assembly Diamondback used was guaranteed to cut holes in the casing. (5RR137-38).

---

explain), no witness testified seeing Permian use the wrong or defective slips (or do anything else wrong during the casing run), Britton could only assume the slips caused damage because of his belief the pipe was good when it went into the well, and where no one witnessed the entirety of the pipe inspection.

Further, there was no uniformity to the damage to a depth of 2,700 feet. (Resp. at 42) (4RR241-42; *see* 6RR226-33; 5RR128-33). Even if Diamondback had not reamed past 900 feet, Diamondback's clumsy efforts damaged and compromised the casing such that alternative remedial efforts were now not viable. (5RR30-33).[9]

While Diamondback disputes that it could have used swages or rollers to remediate any problem (Resp. at 43), the fact remains Diamondback didn't, and instead used the string mills, which assured grinding and reaming of metal and holes in the casing. (5RR137-38). It does not change that Diamondback's actions could have and did damage the casing. Alternative techniques would not have undermined the casing's integrity and were less expensive than Diamondback asserts. (5RR138-46). Even Hollis admitted that rollers are not abrasive and do not grind pipe, they're potentially less aggressive than mills. (3RR204-07).

Diamondback's failure to cut and pull the casing, or allow Permian to do it, caused Diamondback's damages. (Br. at 60-62). The MSA contemplated that Permian would have the opportunity to remedy problems, but Diamondback did not give Permian that chance before grinding the pipe interior or plugging and

---

[9] Diamondback relies on the pressure test as indicative that Diamondback did not cause a hole. (Resp. at 42). It begs the question: if the casing held pressure, why did Diamondback abandon it? Its concerns about the pipe's integrity were unfounded.

abandoning the well. (*Id.*; *see* CR 20). Both Lemons and Grace testified that cutting and pulling the casing was easy, feasible (at least before the milling operations), and less expensive. (*See* Br. at 60-61). The evidence showed that Diamondback caused or exacerbated its damages.

## V. <u>Evidence Overwhelmingly Showed that Diamondback Failed To Mitigate Its Damages</u>

Diamondback failed to mitigate its damages. (*See* Br. at 62-65). Diamondback used aggressive string mills, shearing away pipe and cutting holes in it, instead of using swages, rollers, or smaller tools, and failed to try cutting and pulling the casing or give Permian the opportunity to do so. (*Id.*).

Diamondback suggests it gave Permian an opportunity to fix the issue, and cites testimony by Hollis claiming that the company man—Villasana—called Bownds sometime after Diamondback could not get down the well. (3RR156-57). But Villasana expressly testified that he did not. (4RR175). Bownds testified that sometime *after* Diamondback had run the reamer, Leonard Bernard called him and said there was a problem and Diamondback was running reamers, but did not ask Permian to do anything. (5RR83-84). This disproves that Diamondback did not get a response for 3-4 days as it claims; instead it proves Diamondback did not wait to discuss alternative measures, but immediately began its aggressive milling. Hollis testified Diamondback did not discuss with Permian the possibility of cutting and pulling the casing. (3RR165).

29

Britton's testimony that Diamondback didn't cause any damage by using the string mills conflicts with Hollis's admissions. ((6RR429; 3RR146-59; 4RR27-28). Britton had no basis for asserting that Permian couldn't cut and pull the casing where Lemons testified he had performed this countless times. (5RR30-33, 46-47).

Grace did not "approve[] of milling as an appropriate remedial measure under the circumstances." (Resp. at 45). Grace said that milling would be the "very last resort" here. (5RR160). Grace offered more reasonable alternatives that should have been tried first: rollers, swages, smaller tools, and cutting/pulling the casing. (*See* 5RR138-46). Finally, testimony from Lemons and Grace showed that cutting and pulling the casing was easy, safe, and less expensive than plugging and abandoning the well. (5RR30-33, 140-48).

The great weight and preponderance of the evidence proved that Diamondback failed to mitigate its damages.

## VI. Admission of Exhibit 60A Was an Abuse of Discretion

The trial court abused its discretion in admitting Exhibit 60A, where Diamondback failed to lay the proper predicate for the admission of the invoices under the business records exception to the hearsay rule.[10]

---

[10] Diamondback's assertion that Permian's objection on appeal varies from that at trial is incorrect. (Resp. at 46 n.15). The context makes clear that Permian objected that Diamondback had not established the foundation for the documents to come in under the business records exception to the hearsay rule. (3RR183-97; 4RR7-9). Even Diamondback's counsel tried to

Hollis did not lay a proper foundation for admitting Exhibit 60A. Permian's counsel challenged Hollis to show his personal knowledge of who created the invoices, whether the work in each invoice was actually performed or who performed it, what information was used to prepare the invoices, and whether they had been paid. (3RR195-97). Hollis could not show such knowledge. (*Id.*). Diamondback's attempt to clean up Hollis's testimony did not rectify the problem; Hollis offered conclusory answers that the invoices were kept in the course of Diamondback's business, and stated that if the invoice was in the binder it had been paid. (4RR6-8).

Hollis had no personal knowledge of the invoices' accuracy, and thus, failed to demonstrate their accuracy or that Diamondback's keeping of the invoices created by others were done in the regular course of business. (Br. at 68-69); *see In re E.A.K.*, 192 S.W.3d 133, 142-43 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Powell v. Vavro, McDonald & Assoc., L.L.C.*, 136 S.W.3d 762, 765 (Tex. App.—Dallas 2004, no pet).

Exhibit 61 was merely a summary of the invoices. (9RR928-35). A summary of business records may be admitted into evidence upon proof (1) that the records are voluminous, (2) they have been made available to the opponent for a reasonable period of time to afford inspection and an opportunity for cross-

---

establish the exception by asking questions of Hollis on the elements of Rule 803(6). (3RR192-94; 4RR7).

examination, and (3) the supporting documents are themselves admissible in evidence. *See Black Lake Pipeline Co. v. Union Construction Co.*, 538 S.W.2d 80, 92-94 (Tex. 1976), *overruled on other grounds*, *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989). A summary is no more admissible than the underlying records. *Id.* Here the underlying invoices were not admissible; the Exhibit 61 summary was no evidence of damages. *See id.*

Hollis's testimony was based on estimates demonstrated to be unreliable, and his testimony about costs to remediate and replace the 14-11 well was conclusory where he offered no detail as to the individual activities and associated costs. (*See* Br. at 70 n.8). Britton's testimony about the *reasonableness* of Diamondback's estimates of remedial and replacement damages is no evidence of the *actual* costs, where Britton merely based his statement on a review of the same invoices and similarly had no foundation for such. (4RR203).

The invoices were the only evidence attempting to demonstrate the amount of damages. Because they were not cumulative of any other evidence, and the judgment turned on this evidence, the erroneous admission of Exhibit 60A led to the rendition of an improper judgment. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

## VII. Damage Awards Not Supported by Legally or Factually Sufficient Evidence

As discussed and incorporated here, the damages awards by the jury for remedial and replacement damages are not supported by legally or factually sufficient evidence, and are excessive. (Br. at 71-72). Permian did not cause the damage, and even if it had, Diamondback exacerbated that damage and failed to remediate. (*Id.*).

While Diamondback asserts its replacement well costs extended through September 30, 2013, the daily drilling reports showed that the intermediate casing on the replacement well was cemented into place on September 27-28, 2013. (6RR529). Exhibit 61 confirmed this, showing an entry for the cementing company (O-Tex Pumping) on September 27, 2013. (9RR934).[11] The drilling reports also showed that, at the latest, Diamondback moved from the intermediate casing to production casing on September 29, 2013. (6RR534). Thus, in addition to the fact the evidence is legally and factually insufficient to support any damages awarded by the jury, the amounts of damages awarded are excessive because they awarded costs past the point Diamondback could attempt to get in the hole on the replacement well.

---

[11] Permian does not concede that Exhibit 61 was admissible or proved damages.

## VIII. <u>Attorney's Fees Awards Are Not Supported by Legally or Factually Sufficient Evidence</u>

Diamondback's evidence of attorney's fees is legally and factually insufficient to support the trial court findings of fact/conclusions of law numbers 11-17 (CR644-46) and findings of act Order numbers 6-9 (CR641-42) and judgment. (Br. at 73-79).

Findings of fact are not binding if there is no evidence to support the finding or the contrary is established as a matter of law. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex. 1986). In determining what the law is and applying the law to the facts, a trial court has no discretion. *Tenaska Energy*, 437 S.W.3d at 523. The legal conclusions of the trial court are not binding on appellate courts. *Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 264 (Tex. App.—Dallas 2012, pet. denied) (citing *Pegasus Energy Grp. v. Cheyenne Pet. Co.*, 3 S.W.3d 112, 121 (Tex. App.—Corpus Christi 1999, pet. denied)).

Generally, the determination of reasonable attorney's fees is a question of fact and "'the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury.'" *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). But even uncontradicted affidavits are assailable when they are not clear, direct and positive, and not free from contradiction, inaccuracies, and circumstances tending to cast

suspicion thereon. *Id.* Uncontradicted affidavits are certainly not conclusive. *Id.* An uncontroverted affidavit is generally sufficient to support an award of attorney's fees only when it sets forth the affiant's qualifications, his opinion regarding reasonable attorney's fees, *and the basis for his opinion.*" *Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 894 (Tex. App.—Texarkana 2009, pet. denied) (emphasis added).

The affidavits and attachments Diamondback submitted to support attorney's fees failed to provide evidence to support the findings of fact/conclusions of law. (CR269-70). While the affidavit provides a listing of the attorneys involved in the case and their rates, it says nothing about the experience, reputation, or ability of each lawyer performing the services (only Bill Caraway's resume is attached). (CR268-74). The assertion that "The fees charged in this case are customarily charged in this area for the same or similar services for attorneys with similar levels of experience, reputation, and ability, considering the nature and complexity of the matters in controversy, the time limitations imposed, and the results obtained" does not fill this gap. (CR273). Similarly, there is no basis to support fees by the legal assistants, where the affidavit makes only conclusory statements. (CR270; Br. at 76).

Diamondback's affidavit did not establish fees as a matter of law where it was not clear, direct, and positive, and not free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, especially where Caraway

35

provided no basis for much of his opinions. Even if it were *some* evidence of a reasonable fee, which is not conceded, it is certainly not conclusive. *Garcia*, 319 S.W.3d at 642.

And parties are indeed required to segregate recoverable attorney's fees:

[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees . . . it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006). The court does not look at the legal work as a whole, but parses the work into component tasks to determine which tasks relate to recoverable claims. *See id.*

Contrary to Diamondback's assertions (Resp. at 53), its exhibits are rife with entries regarding insurance work that are unrecoverable, e.g.: "research on *direct* insurance claims in Texas," "research regarding reservation of rights letter," "research regarding additional insured status," "review primary insurance policy for claims." (CR 592-96). Caraway's affidavit does not state or explain why such insurance research and work is solely part of the breach of contract action; he makes conclusory statements that he "believes" that none of the fees relate solely to claims for which attorneys' fees are unrecoverable. (CR 273). It was

Diamondback's burden to segregate and prove recoverability of attorney's fees; it failed to do so. *See Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007).[12]

Diamondback failed to provide legally or factually sufficient evidence of conditional appellate attorney's fees. (Br. at 77-78). While Diamondback relies on Caraway's affidavit to establish such fees, that affidavit is without factual basis and wholly conclusory where Caraway offered only generalized estimates of $150,000 for an appeal to the court of appeals, $50,000 for a petition for review, and $25,000 for oral argument. (CR271). Caraway provided no opinion on the "complex factual and legal issues" or the "significant labor" that would be involved in an appeal. (CR271-72). Evidence of conditional appellate fees requires more than generalized estimates of fees. *Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.*, 414 S.W.3d 911, 930 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

The *El Apple*[13] analysis is entirely appropriate. Diamondback undertook the lodestar method to attempt to prove its attorney's fees, by asserting the hourly fee for various attorneys and then claiming the fees based on the time expended on the litigation based, and employed this method in attempting to estimate appellate

---

[12]     *Feldman v. KPMG LLP*, 438 S.W.3d 678, 688 (Tex. App.—Houston [1st Dist.] 2014, no pet.) provides no support; the attorney affirmatively stated that 100% of his time was spent on recoverable claims). And in contrast to *Five Star Int'l Holdings, Inc. v. Thomson, Inc.*, 324 S.W.3d 160, 171 (Tex. App.—El Paso 2010, pet. denied), Diamondback's exhibit indicates the expenses at issue were performed in pursuit of claims or defenses outside of the breach of contract claims. (*See* CR 592-96).

[13]     *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012).

attorneys' fees. (*See* CR271). While the lodestar method might not be required in breach of contract cases, as Diamondback asserts, that is the method Diamondback pursued and proposed lodestar findings of fact and conclusions of law to support the award that the trial court ultimately signed. (*See* CR644-66; Appx. Tab A).[14] It cannot now run from it after failing to prove up the fees.[15] Further, *El Apple*'s requirements apply to conditional appellate fees for estimated future work. *See Sentinel Integrity Sols.*, 414 S.W.3d at 930. That none of the work had been performed does not excuse the requirements. *See id.* Caraway's affidavit failed to provide legally sufficient evidence of appellate attorney's fees.

---

[14]     Permian requested that Diamondback's proposed findings of fact and conclusions of law be included in the clerk's record (CR653), but they were omitted. They are attached here as Appendix A. Permian has requested that the clerk supplement the record. Regardless, it is clear the trial judge edited then signed Diamondback's proposed findings and conclusions. (CR644-66).

[15]     Diamondback's assertion that Permian did not raise a specific objection regarding *El Apple* is misplaced. (Resp. at 55). Permian objected to all evidence and affidavits submitted to support the attorney's fees award, and challenged the legal and factual sufficiency of the attorney's fees in post-trial motions (CR427-33, 566-67, 585-90, 623-24, 632). An attorney fee award must be supported by competent evidence. *Jamshed v. McLane Exp. Inc.*, 449 S.W.3d 871, 883 (Tex. App.—El Paso 2014, no pet.) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 852 (Tex. 2000)). And if an affidavit speaks in generalities, it is no evidence of conditional appellate fees. *See Sentinel Integrity Sols.*, 414 S.W.3d at 930; *see also Coastal Terminal Operators v. Essex Crane Rental Corp.*, No. 14-02-00627-CV, 2004 WL 1795355*, at *8 (Tex. App.—Houston [14th Dist.] Aug. 12, 2004, pet. denied) (conclusory statements regarding appellate fees constituted no evidence to support the reasonableness of fees). Because Diamondback failed to submit legally sufficient evidence of appellate attorney's fees, a judgment awarding such fees cannot stand. *Sentinel Integrity Sols.*, 414 S.W.3d at 930; *Cf. Jamshed*, 449 S.W.3d at 884.

Ultimately, Diamondback did not produce legally or factually sufficient evidence to support the attorney's fees awards. (*See* Br. at 73-78).

## CONCLUSION AND PRAYER

**THEREFORE**, Appellant Permian Power Tong, Inc. respectfully prays this Court sustain its issues on appeal, reverse the trial court's December 10, 2015 Final Judgment, render a judgment that Diamondback takes nothing on its claims, dismiss all of Diamondback's claims with prejudice, and remand for consideration and determination of Permian's attorney's fees recoverable under the MSA, tax Permian's costs against Diamondback, and grant Permian such other and further relief as this Court deems just. Alternatively, based on the factual insufficiency of the evidence, this Court should reverse the Final Judgment and remand for new trial, or suggest a significant remittitur of damages, or, further, reverse the award of attorney's fees and remand that issue for further proceedings.

Respectfully submitted,

**COOPER & SCULLY, P.C.**


By: /s/Diana L. Faust

      **R. BRENT COOPER**
      brent.cooper@cooperscully.com
      Texas Bar No. 04783250
      **DIANA L. FAUST**
      diana.faust@cooperscully.com
      Texas Bar No. 00793717
      **KYLE M. BURKE**
      kyle.burke@cooperscully.com
      Texas Bar No. 24073089

900 Jackson Street, Suite 100
Dallas, Texas 75202
TEL: (214) 712-9500
FAX: (214) 712-9540

**COUNSEL FOR APPELLANT
PERMIAN POWER TONG, INC.**


## CERTIFICATE OF COMPLIANCE

I hereby certify that this Reply Brief of Appellant was prepared using Microsoft Word 2010, which indicated that the total word count (exclusive of those items listed in rule 9.4(i)(1) of the Texas Rules of Appellate Procedure, as amended) is 7,495 words.


    /s/Diana L. Faust
**DIANA L. FAUST**

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of this Reply Brief of Appellant upon on all counsel of record, via efile, on this the 19th day of September, 2016.

Mr. David E. Keltner                                          **VIA EFILE**
david.keltner@kellyhart.com
Ms. Marianne M. Auld
marianne.auld@kellyhart.com
Mr. Matthew D. Stayton
matt.stayton@kellyhard.com
Kelly Hart & Hallman, L.L.P.
201 Main Street, Suite 2500
Fort Worth, Texas 76102
**Counsel for Appellee**

Mr. Bill B. Caraway                                          **VIA EFILE**
bill.caraway@kellyhart.com
Kelly Hart & Hallman, L.L.P.
508 W. Wall Street, Suite 444
Midland, Texas 75202
**Counsel for Appellee**


_/s/Diana L. Faust_____
**DIANA L. FAUST**

ORAL ARGUMENT REQUESTED

NO. 12-16-00092-CV

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS AT TYLER, TEXAS

PERMIAN POWER TONG, INC.,
Appellant,

v.

DIAMONDBACK E&P, LLC,
Appellee.

On Appeal from the 441st District Court
Midland, County, Texas, Cause No. CV-49854
(Hon. Rodney W. Satterwhite)

APPENDIX TO REPLY BRIEF OF APPELLANT

In compliance with rule 38.1(j) of the Texas Rules of Appellate Procedure,

Appellant Permian Power Tong, Inc. submits this Appendix to its Reply Brief of

Appellant containing the following items:

Tab A:    February 1, 2016 Plaintiff's Proposed Findings of Fact and
          Conclusions of Law

D/950986v5

# APPENDIX TAB "A"

CAUSE NO. CV 49854

| | | |
|---|---|---|
| DIAMONDBACK E&P LLC, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| VS. | § | MIDLAND COUNTY, TEXAS |
| PERMIAN POWER TONG, INC., | § | |
| Defendant. | § | 441ST JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Texas Rules of Civil Procedure, the Court hereby makes the following findings of fact and conclusions of law:

1. The parties stipulated and agreed that all awards of attorneys' fees and costs would be submitted to the Court, by affidavit, following the jury trial.

2. Section 25 of the Master Service Contract ("MSC") between Diamondback E&P, LLC's predecessor in interest and Permian Power Tong, Inc. states that if either party files suit to enforce any rights under the MSC, the prevailing party shall be entitled to recovery of reasonable attorney's fees and costs.

3. Diamondback E&P, LLC ("Diamondback") filed suit to enforce certain rights under the MSC, including breach of contract claims, and sought damages.

4. Diamondback is the prevailing party. Diamondback was awarded damages totaling $824,137.97.

5. Diamondback is entitled to recover its reasonable attorneys' fees and costs under the MSC.

6. Diamondback is entitled to recover its reasonable attorneys' fees and costs under section 38.001(8) of the Texas Civil Practice and Remedies Code.

7. On November 11, 2015, Diamondback submitted the following evidence in support of its claim for reasonable and necessary attorneys' fees and costs: (i) the

2090183_1

Affidavit and resume of attorney Bill B. Caraway, (ii) relevant billing invoices and timecards for legal services rendered in this case, and (iii) summary charts of the attorneys' fees and costs incurred for legal services rendered in this case.

8. Following objections by Permian Power Tong to redacted invoices and alleged block billing, on November 19, 2015, Diamondback submitted the following supplemental evidence in support of its claim for reasonable and necessary attorneys' fees and costs: (i) the Supplemental Affidavit of Bill B. Caraway, and (ii) complete and unredacted billing invoices and timecards for legal services rendered in this case.

9. On December 2, 2015, Permian Power Tong raised additional objections and moved to strike the supplemental evidence submitted by Diamondback. Permian Power Tong offered no evidence to contradict or dispute any evidence or supplemental evidence proffered by Diamondback in support of an award of attorneys' fees and costs.

11. The hourly rates charged by Diamondback's attorneys and legal assistants are consistent with those rates customarily charged in Midland County, Texas, and are reasonable and necessary based on each attorney's experience, reputation and ability.

12. The fees charged by Diamondback's attorneys and legal assistants are reasonable and necessary considering the complexity of the matters in controversy, the skill required, the time spent, the time limitations imposed, the results obtained, the nature and length of the relationship with the client, and the preclusion of accepting other representations while working on this case.

13. All attorneys' fees and court costs sought by Diamondback in this case are reasonable and necessary. All attorneys' fees and court costs sought by Diamondback in this case are supported by sufficient evidence. It is equitable and just for Diamondback to recover its attorneys' fees and costs in this case.

14. Diamondback incurred reasonable and necessary attorneys' fees totaling $319,761.50 for representation through trial and completion of proceedings in the trial court.

15. Diamondback will incur $150,000.00 for representation through appeal to the Court of Appeals, if necessary.

16. Diamondback will incur $50,000.00 for representation through the Petition for Review stage at the Supreme Court of Texas, if necessary.

2090183_1

17.    Diamondback will incur $25,000.00 for representation through oral argument at the Supreme Court of Texas, if necessary.

18.    Diamondback incurred reasonable court costs totaling $3,512.90.

19.    All fees for legal services rendered in this case are recoverable and permitted; thus, there is no requirement that fees be segregated among claims for which fees are recoverable and not recoverable.

20.    Permian Power Tong's objections to evidence in support of attorneys' fees are overruled, and its motion to strike (dated December 2, 2015) is denied.

SIGNED this ___ day of February, 2016.


_____
Rodney W. Satterwhite
Judge Presiding